08-3527-cv
T.Y. v. New York City Department of Education

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: June 22, 2009)                                        Decided: October 9, 2009)

Docket No.  08-3527-cv

_____

T.Y.,  K.Y., ON BEHALF OF T.Y.,

*Plaintiffs-Appellants*,

— v.—

NEW YORK CITY DEPARTMENT OF EDUCATION, REGION 4,

*Defendant-Appellee*.

_____

Before:        B.D. PARKER, WESLEY, *Circuit Judges*, CEDARBAUM, *District Judge.**

Plaintiffs-Appellants T.Y. and K.Y., on behalf of their son, T.Y., appeal from an order of the United States District Court for the Eastern District of New York (Johnson, *J.*) granting summary judgment to Defendant-Appellee New York City Department of Education, Region 4. The parents seek tuition reimbursement under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400-1482 ("IDEA" or "IDEIA").  We hold that because the IDEA does not require that an Individualized Education Plan ("IEP") name a specific school placement, T.Y's IEP was not procedurally deficient.  Furthermore, applying our deferential standard of review in IDEA cases, we conclude that T.Y.'s IEP did not substantively violate the IDEA.

AFFIRMED.

*        The Honorable Miriam Goldman Cedarbaum, of the United States District Court for the Southern District of New York, sitting by designation.

_____

GARY S. MAYERSON (Tracy Spencer Walsh, *on the brief*), Mayerson & Associates, New York, New York, *for* Plaintiffs-Appellants.

SUZANNE K. COLT, Assistant Corporation Counsel (Pamela Seider Dolgow, Andrew J. Rauchberg, Karyn R. Thompson, of Counsel, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, *for* Defendant-Appellee.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

T.Y. is a child with autism. His parents sued the New York City Department of Education ("NYCDOE") on his behalf seeking reimbursement for T.Y's private school tuition under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400-1482 ("IDEA" or "IDEIA"). The United States District Court for the Eastern District of New York (Johnson, *J.*) granted summary judgment to the NYCDOE, and the parents now appeal.

We affirm.

**BACKGROUND**

T.Y., like all children with a disability, is entitled to a free and appropriate public education under the IDEA. *See* 20 U.S.C. § 1400(d)(1)(A). As we have previously stated, "[t]he centerpiece of the IDEA's education delivery system is the individualized education program, or 'IEP.'" *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005) (internal quotation marks omitted). "The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance,

2

and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id*. (internal quotation marks omitted). If a disabled child's parents are dissatisfied with the IEP, as here, they may file a complaint with the state educational agency. There, the complaint will be heard by an impartial hearing officer ("IHO"), 20 U.S.C. § 1415(f), whose decision may be appealed to a state review officer ("SRO"), § 1415(g). The child's parents can, in turn, appeal this decision to a federal or state court. *See* § 1415(i)(2)(A).

T.Y., who has significant developmental delays and a severe language disorder as a result of his autism, began receiving early intervention services when he was one and a half years old, and in the 2005-2006 school year, he was placed in a special education class. On May 10, 2006, T.Y.'s Committee on Special Education ("CSE") met to form T.Y's IEP for the 2006-2007 school year ("May IEP"). The CSE included T.Y.'s parents, as well as a district representative, a special education teacher, a school psychologist and an Applied Behavioral Analysis teacher. The IEP recommended that T.Y. be placed in a special class with a 6:1:1 staffing ratio, and advised that he receive three 30-minute sessions per week of individualized speech and language therapy, two 30-minute sessions per week of individualized occupational therapy, and two 30-minute sessions of individualized physical therapy per week. The IEP recognized that T.Y. sometimes responded to frustration by crying, biting his hand and pulling his hair, and recommended that these issues be managed through "modeling, reinforcement, [and] prompting of appropriate classroom behaviors." Partially to address these behaviors, the IEP also provided for "a full-time 1:1 crisis management paraprofessional."

Although T.Y.'s May IEP stated that T.Y.'s school would be in District 75, a group of

schools that specialize in providing education for children with disabilities, it did not name the school that T.Y. would attend. Rather, on June 9, 2006, approximately a month after the IEP was formalized, the parents received a notice in the mail that recommended a specific school placement. T.Y.'s father visited the site and found it unsuitable for T.Y. for various reasons, including the staff's alleged rudeness and the lack of a gym or occupational therapy room. The NYCDOE offered the parents another school, which T.Y.'s parents called, but also found to be unsuitable. Subsequently, the parents enrolled T.Y. in the Rebecca School, a specialized private school for autistic children, and notified the NYCDOE of their intent to seek reimbursement.

T.Y.'s parents requested an impartial hearing for reimbursement. They raised numerous substantive and procedural objections to T.Y.'s May 2006 IEP, contending, *inter alia*, (1) the IEP materially violated T.Y.'s right to a free and appropriate education, in part because the IEP did not provide T.Y. with adequate speech services and the IEP failed to provide sufficient parent training to the parents, and (2) the IEP was procedurally deficient because it did not include a specific school placement.

The IHO conducted a lengthy hearing. In addition to submitting evidence from private evaluators, the parents testified at the hearing, along with the Program Director at the Rebecca School and various professionals who had worked with T.Y. both in school and at home. In support of their claims, the parents also submitted T.Y.'s previous IEP, which was prepared in March of 2006 ("March IEP"), just two months before the May IEP. The March IEP provided T.Y. with substantially more speech and language skill services than the May IEP, and the March IEP named a specific school placement. An administrator from the NYCDOE, Kenneth Stark,

4

also testified.

The IHO denied most of the parents' claims. The IHO rejected the parents' argument that the IEP was procedurally deficient because it failed to name a specific school placement, explaining that T.Y.'s CSE had "identified a type of program, and then the parent was given the opportunity to see suggested sites," such that the IHO could not "see how the parents were harmed by the failure to identify a site at the CSE meeting." The IHO did, however, agree with the parents that the IEP did not effectively meet T.Y.'s speech and language needs, and ordered that the IEP include an additional three hours of speech and language therapy per week. However, the IHO determined that this deficiency alone did not establish that "the overall program recommended by the CSE was inappropriate, except to the extent that outside speech and language services were not offered in addition to those offered in school."

On appeal, the SRO largely agreed with the IHO's findings and conclusions, but reversed on one point, concluding that parent counseling and training should have been specifically named in T.Y.'s IEP.

T.Y.'s parents subsequently filed suit in the United States District Court for the Eastern District of New York, seeking review of the administrative determinations. The district court, after considering the NYCDOE's Rule 56.1 statement, and deferring to the findings and conclusions of the IHO and SRO, granted summary judgment to the NYCDOE.

## DISCUSSION

Our standard for reviewing a state's administrative decisions in IDEA cases is, by now, well established. We have frequently explained that "the role of the federal courts in reviewing

state educational decisions under the IDEA is circumscribed." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks, alterations and internal citations omitted). Therefore, as the Supreme Court has concluded, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).

We undertake a three-step process to determine whether parents are entitled to tuition reimbursement. *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 192 (2d Cir. 2005). First, we consider whether the school district has complied with the IDEA's procedural requirements. *Id.* Next, we ask whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted). If the answer to either of these questions is "no," we then ask whether "the private schooling obtained by the parents is appropriate to the child's needs." *Id.*

I.      Rule 56.1 Statements in IDEA Cases

We have not squarely faced the role, if any, that Rule 56.1 statements play when courts review IDEA cases. Local Rule 56.1 was adopted to aid the courts in deciding summary judgment motions by quickly identifying disputed material facts. The Rule requires that any motion for summary judgment be accompanied by a list of the "material facts as to which the

6

moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a). The requirement is strict; failure to submit a Rule 56.1 statement with a motion for summary judgment may result in the motion's denial. *Id.* Should the nonmoving party wish to contest the assertions contained within a Rule 56.1 statement, the nonmoving party must respond to each of the statement's paragraphs and include, if necessary, a statement of the additional material facts that demonstrate a genuine issue for trial. Local Civil Rule 56.1(b). A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible. *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998). In the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met. *See, e.g.*, *Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000).

A summary judgment approach to IDEA cases, however, is different. Instead of dispute resolution, a motion for summary judgment can serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled. *See Lillbask*, 397 F.3d at 83 n.3. The court's inquiry is twofold: first, it reviews the state's compliance with IDEA procedures and, second, the court determines if the IEP created through those procedures was "reasonably calculated to enable the child to receive educational benefits." *Id.* Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence. 20 U.S.C. § 1415(i)(2)(C); *Rowley*, 458 U.S. at 206; *Cerra*, 427 F.3d at 191-92. The court's inquiry is a results-based standard in many respects, concerned

7

more with a just outcome for a disabled student than with judicial efficiency. *See Rowley*, 458 U.S. at 206-07. A Rule 56.1 statement, while not required, may assist the court's inquiry into whether IDEA procedures were followed and whether the result was reasonably designed to confer educational benefits. But while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive. The district court's characterization of Appellee's Rule 56.1 statement as "necessary" was therefore not entirely correct. The court's error was of no consequence, however, because we are satisfied that the court conducted an independent review and carefully reviewed the record, as is required by the statute.

II.    Substantive Violations

The parents argue that the hearing officers erred in not finding that the IEP substantively deprived T.Y. of a free and appropriate education, notwithstanding the officers' conclusions that the IEP was deficient in speech and language services and parent training. In addition, the parents argue that the NYCDOE's failure to provide for a Functional Behavioral Assessment ("FBA") or Behavior Intervention Plan ("BIP") to address T.Y.'s biting, hair pulling and other behaviors amounted to a substantive violation of the IDEA.

As we have noted on several occasions, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195. Indeed, we have reversed a district court's findings where we determined that "the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same

8

evidence." *Id.* (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)).

Under this standard of review, we agree with the NYCDOE that the administrative officers' opinions, which were thorough and well-reasoned, deserve deference. While the parents argue that a crisis paraprofessional is no substitute for an FBA or a BIP, there is substantial evidence in the record that the 1:1 aide provided significant benefits to T.Y. in addressing the problematic behaviors. We agree that the record does indicate that the initial IEP lacked the requisite speech and language services and parent training, but conclude that these errors were suitably corrected by the IHO and SRO, and do not render the IEP as a whole substantively deficient. In short, we see no reason to second guess the reasonable, professional determinations of the IHO and SRO in this case.

III.     Procedural Violations

Finally, the parents argue that the NYCDOE's policy of not specifying a particular school in the IEP deprived them of their right to meaningful participation in the IEP's development. At the hearing before the IHO, Kenneth Stark, a representative from the NYCDOE, testified that in New York a specific school placement is never offered at the IEP meeting, and that the child's placement is rather determined by "a citywide placement officer who looks at which school would be the most appropriate."

The parents point to various implementing regulations of the IDEA, which provide, in part, that "the parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to . . . [t]he identification, evaluation, and educational *placement* of the child." 34 C.F.R. § 300.501(b)(1)(i) (emphasis added). The parents also direct our attention to

9

20 U.S.C. § 1414 (d)(1)(A), which defines "individualized education program" as a statement that includes, *inter alia*, "the anticipated frequency, *location*, and duration of those services." § 1414(d)(1)(A)(i)(VII) (emphasis added). Given this language, the parents argue that "[t]he procedural safeguards of the federal IDEIA statute thus make clear that parents are to be afforded meaningful participation in the decision-making process as to the location and placement of their child's school and classroom."

While the parents' citation of the statute and regulations is, at first glance, compelling, upon closer evaluation we conclude that this language does not compel the result the parents seek. As we have previously stated, the term "educational placement" in the regulations "refers only to the general type of educational program in which the child is placed." *Concerned Parents v. N.Y. City Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir. 1980). "Educational placement" refers to the general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the "bricks and mortar" of the specific school.

Further, the requirement that an IEP specify the "location" does not mean that the IEP must specify a specific school site. The United States Department of Education ("USDOE") expressly considered this question in its commentary to the 1997 amendments to the IDEA. In that commentary, the USDOE noted,

> Some commenters requested that the term "location" be defined as the placement on the continuum and not the exact building where the IEP service is to be provided . . . . Other commenters similarly stated that a note be added clarifying that "location" means the general setting in which the services will be provided, and not a particular school or facility.

10

Assistance to States for the Education of Children with Disabilities and the Early Intervention

Program for Infants and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12594 (Mar. 12, 1999).

In resolving this issue, the USDOE concluded that "[t]he location of services in the context of an

IEP generally refers to the type of environment that is the appropriate place for provision of the

service. For example, is the related service to be provided in the child's regular classroom or

resource room?" *Id.*

This conclusion comports with the Senate's commentary, which states that "[t]he location

where special education and related services will be provided to a child influences decisions

about the nature and amount of these services and when they should be provided to a child." S.

Rep. No. 105-17, at 21 (1977). "For example, the appropriate place for the related service may

be the regular classroom, so that the child does not have to choose between a needed service and

the regular educational program." *Id.* "For this reason," the commentary continues, "in the bill

the committee has added 'location' to the provision in the IEP that includes 'the projected date

for the beginning of services and modifications, and the anticipated frequency, location, and

duration of those services.'" *Id.* (emphasis omitted). We interpret these statements to indicate

that the term "location" does not mean the specific school location, but the general environment

of the overall program.

Therefore, we conclude that because there is no requirement in the IDEA that the IEP

name a specific school location, T.Y.'s IEP was not procedurally deficient for that reason. We

emphasize that we are not holding that school districts have carte blanche to assign a child to a

school that cannot satisfy the IEP's requirements. We simply hold that an IEP's failure to

11

identify a specific school location will not constitute a *per se* procedural violation of the IDEA. *See White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003). *But see A.K. ex rel J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir. 2007).

We note, however, that notwithstanding our holding here, the evidence reflects that T.Y.'s parents *did* participate in school selection and that the NYCDOE worked cooperatively with the parents after they voiced their objections. The NYCDOE offered the parents one school, which they rejected. The NYCDOE offered the parents another school, which they also rejected without an on-site visit. The parents then enrolled their child into the Rebecca School without allowing the NYCDOE an opportunity to offer yet another school. The parents' actions suggest that they seek a "veto" over school choice, rather than "input"—a power the IDEA clearly does not grant them. *See White*, 343 F.3d at 380.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

12