**DEER VALLEY UNIFIED SCHOOL DISTRICT, Plaintiff,**

v.

**L.P., Student, by and through Parent Krystal SCHRIPSEMA, Defendant.**

**No. CV–11–02297–PHX–ROS.**

United States District Court, D. Arizona.

March 21, 2013.

Karl H. Widell, Gust Rosenfeld PLC, Phoenix, AZ, for Plaintiff.

Amy G. Langerman, Amy Langerman PC, Coronado, CA, for Defendant.

## ORDER

ROSLYN O. SILVER, Chief Judge.

Pending before the Court are the parties' cross motions for summary judgment. (Docs. 18 and 21). For the reasons below, the cross motions for summary judgment will be granted in part and denied in part. The Court will affirm the ALJ's decision that the District committed a substantive IDEA violation, reverse the ALJ's decision that the District committed a procedural IDEA violation, and order the District to reimburse the parent for costs incurred sending L.P. to Sierra and place L.P. at Sierra at the District's expense.

## BACKGROUND

### I. Procedural Background

On July 21, 2011, Krystal Schripsema ("the parent") filed a complaint on behalf of her minor son ("the student" or "L.P."), with the Arizona Department of Education ("ADE"). ADE referred the complaint to the Arizona Office of Administrative Hearings ("OAH") for a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing, heard evidence and issued a decision granting the student's requested relief. The ALJ concluded Deer Valley Unified School District (the "District") denied L.P. a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. The District appealed the ALJ decision. The parties filed cross motions for summary judgment.

### II. Standard of Review

A party aggrieved by the findings and decision rendered in an administrative hearing has the right to bring a civil action for judicial review under the IDEA. 20 U.S.C. § 1415(i)(2)(A). "In an action for judicial review of an administrative decision, the burden of persuasion rests with the party challenging the ALJ's decision." *L.M. v. Capistrano Unified School Dist.*, 556 F.3d 900, 910 (9th Cir.2009).

While the district court's review is de novo, the district court must give the ALJ's determinations "due weight." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1008–09 (9th Cir.2009). The district court must "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and base "its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). In reviewing ALJ rulings, courts are "free to determine independently how much weight to give the administrative findings [but] the courts are

not permitted simply to ignore [them]." *Capistrano,* 556 F.3d at 908. A court must "accord more deference to administrative agency findings that it considers thorough and careful." *Id.* A court must also defer to "judgments of education policy." *Ojai Unified School Dist. v. Jackson,* 4 F.3d 1467, 1472 (9th Cir.1993).

The ALJ decision in this case is an 18–page order setting forth the witnesses, procedural history, evidence and issues at the hearing, detailed findings of fact with citations to the record, and a recitation and application of the law. (Doc. 17, Ex. 28). The ALJ decision states the ALJ "has read and considered each admitted Exhibit," and "the testimony of every witness," even if not mentioned in the decision. (*Id.,* at 3, n. 6). The decision contains citations to the supporting documents and testimony and appears to be thorough and careful, particularly with regard to the IEP process and the parent's participation in that process. The ALJ's conclusions of law are thorough and set forth the legal standard with citations to case law and statute. It appears the ALJ was aware of the applicable legal standard and applied that standard. Under these circumstances, the Court concludes the ALJ's findings are entitled to significant weight.

█ Though not a "true motion for summary judgment, the appeal of an IDEA based due process hearing is properly styled and presented by the parties in a summary judgment format." *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). But "[a] summary judgment approach to IDEA cases ... is different." *T.Y. v. New York City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009). Disputed issues of fact often exist in IDEA cases but do not prevent summary judgment. *Wartenberg,* 59 F.3d at 891. Instead, such disputes are the point of the district court's review of the administrative record. *Ashland Sch. Dist.,* 588 F.3d at 1008. Statements of fact are helpful to present issues in dispute and facts in the record, but the Court reviews the entire record to reach a determination. *T.Y.,* 584 F.3d at 418.

## III. Findings of Fact

### 1. L.P.

L.P. is a first-grader who has been diagnosed with Autism Spectrum Disorder. L.P. is eligible for special education under the primary category of Autism and secondary category of Speech/Language Impairment. (Doc. 17, Ex. 23, at 75). L.P. has been characterized by some as "high functioning" because he has average cognitive abilities and pragmatic language skills. L.P. has deficits in communication and socialization that are typical of autism. L.P. has behavioral issues that can impede his learning.

L.P. is able to communicate his wants and needs to staff. He understands routine and functional directions, such as "put the game on the shelf." L.P. runs and interacts with his peers on the playground and is able to work in small groups with peers. (Doc. 17, Ex. 23, at 72, 75). However, L.P. refuses to follow teacher directions in the general education classroom. L.P. has difficulty waiting his turn and sometimes becomes angry, refuses to wait his turn or tries to change the activity. (*Id.,* at 76). L.P.'s communication strengths include being able to express his wants, need and ideas with sentence length utterances. L.P. is able to follow two-part directions but not three-part instructions. L.P.'s speech is intelligible 90% of the time. L.P. demonstrates fluid speech but is repetitive. (Doc. 17, Ex. 23, at 74).

L.P. can communicate what words mean that are contained in an age-appropriate story read to him. He can match shapes, colors and foods into basic categories. L.P. has difficulty writing his name with

correct letter form and cannot read any letters independently. L.P. is unable to produce rhyming words and cannot identify the initial and final letter of a spoken word. (Doc. 17, Ex. 23 at 72–73). L.P. is not at grade level and is unable to read, identify sight words and recognize most letters and numbers. (*Id.*, at 75).

Behaviorally, L.P. is a friendly student who tries very hard. L.P. generally responds well to choices and positive reinforcement. L.P. takes pleasure in helping adults. L.P. demonstrates weaknesses in behavioral areas, with the exceptions of anxiety, withdrawal and somatization.[1] L.P. engages in attention-seeking behaviors such as looking to see if anyone observed him when he falls out of a chair in a playful, smiling and apparently deliberate manner. L.P. demonstrates a weakness in self control when he impulsively blurts out a comment to the teacher. (Doc. 17, Ex. 23, at 72–73).

## 2. IEP Goals

On May 5, 2011, the District held an Individual Education Program ("IEP") team meeting and issued an IEP. The parent attended the May 5, 2011 meeting. During the meeting, the IEP team heard from representatives of two schools the parent was considering for placement, Lexis Preparatory School ("Lexis") and Sierra Academy ("Sierra"), both of which have programs for children with disabilities. The IEP team determined a "special school level of service" was needed, but the District stated it would not decide the physical location for L.P.'s services at that meeting.

The IEP identified socialization and communication as important parts of L.P.'s education. It stated:

Student is able to communicate with his peers and the staff. Although his reduced communication skills will impact his involvement and progress in the general curriculum by decreasing his ability to follow classroom instructions of increasing length and complexity, understand and answer teacher questions and express his ideas clearly and effectively [sic]. Without intervention, Student's inconsistent responses to his peers when they call out to him or say "hi" as well as his lack of social turn taking skills during peer group activities could increase the likelihood of him being isolated during peer activities.

(Doc. 17, Ex. 23, at 99). The IEP set goals for L.P. to: respond to greetings of peers; request a turn in group activities with peers; and take turns in social interactions. (Doc. 17, Ex. 23, at 105–07).

Although the IEP states L.P. needs to be educated in a "special school," it does not identify any portion of L.P.'s day when he would be with typical children, either in a general education environment or by bringing typical children into Student's "special school" environment. (Doc. 17, Ex. 23, at 89).

## 3. Prior Written Notice

On May 9, 2011, the District e-mailed the parent a Prior Written Notice ("PWN") stating L.P. would be placed in the autism program located in a special school called Terramar Elementary School ("Terramar"). (Doc. 17, Ex. 23, at 68). The e-mail stated the District wanted to schedule L.P.'s intake so he could start on May 16, 2011.(*Id.*). Terramar was not discussed at the May 5, 2011 meeting, and no Terramar representative attended the

---

1. "Withdrawal" refers to the physical or psychological removal of oneself from a stressor. "Somatization," refers to "a tendency in which a person has physical symptoms that involve more than one part of the body, [and] no physical cause can be found." (Doc. 17, Ex. 23, at 72–73).

meeting. (Doc. 17, Ex. 29, at 157, 1534); (Doc. 17, Ex. 30, at 493).

The decision was made by the District management team, which included Tamara Wheeler ("Wheeler"), a member of the Student Support Services management team, as well as Dr. Richard Gray, Michael Remus and Linda Lewis. (Doc. 17, Ex. 30, at 454, 499). Only Wheeler knew L.P. (*Id.*, at 499). Wheeler also called the parent to inform her of the District's decision.

The parent expressed concern and gave notice of her intent to unilaterally place L.P. in a different school and seek reimbursement. (Doc. 17, Ex. 29, at 158). The District subsequently notified the parent the District would schedule another IEP meeting to "consider" the parent's input, but the notice stated L.P. would attend Terramar, as did a subsequent notice. (Doc. 17, Ex. 30, at 454); (Doc. 17, Ex. 23, at 116–17).

At the subsequent meetings, the parent expressed her belief that Terramar was not an appropriate placement and would not provide a FAPE. Dr. Fray stated, "we do not agree with your concerns but [the parent's] opinion has been noted." (Doc. 17, Ex. 29, at 165–66).

The parent followed through with her plan to unilaterally place L.P. at Sierra Academy ("Sierra"), a private day school for special education students, and seek reimbursement. (Doc. 17, Ex. 29, at 169).

### 4. Autism Program at Terramar

When the District decided to place L.P. at Terramar, Terramar had four students ranging from second to fifth grade in its autistic program classroom. (Doc. 17, Ex. 29, at 40). All four students used augmentative communication devices. Only two of the four students had verbal ability. One of the verbal students was at the "I want" or "I need" level. One student functioned under a two-year-old level in communication skills. When the parent visited Terra-

mar and observed the classroom, none of the four students verbalized. The parent knew one of the students through a baseball league and knew the student was unable to speak. (Doc. 17, Ex. 29, at 56–58, 66, 154, 156).

Kristina Blackledge, an educational consultant who had worked with two of the students, visited the Terramar autism program classroom on more than one occasion and observed none of the four students verbalized or used dialogue. (*Id.*, at 212–13). Two students did not have functional, conversational language abilities. (*Id.* at 211). Blackledge testified Terramar was not an appropriate placement for L.P. because L.P. is conversational and the four students in Terramar's autism program classroom are not verbal. (*Id.*, at 216–17).

While Terramar offers a traditional elementary school setting with typical children on campus, the IEP did not provide for any mainstream time for L.P. (*Id.*, at 74). None of the students in the autism program at Terramar mainstreamed into general education classrooms. (*Id.*, at 51). Students in the autism program at Terramar did not mainstream for lunch but instead ate lunch in their classrooms. (*Id.*, at 36). While students in the autism program may have the opportunity to interact with non-disabled children, that "depend[ed] on the needs of the student related to their goals and their IEP." (*Id.*, at 36). The autism program did not have a schedule for reverse mainstream time, where a non-disabled student would come into the autism program to interact with the students. (*Id.*).

The District's speech therapist agreed it would not be a benefit to L.P. to be placed in a classroom with children who are not functioning as well as he is in speech, language and communication. (Doc. 17, Ex. 30, at 410). The District's autism class teacher stated having similar functioning

peers helps foster social, emotional and communication skills. (Doc. 17, Ex. 29, at 65). Melinda Pelzel, a certified special education teacher in the District and L.P.'s kindergarten teacher, testified placing L.P. with lower functioning children would not benefit L.P. (Doc. 17, Ex. 29, at 117).

Dr. Jordan, a developmental pediatrician who works with children with autism, evaluated L.P. Dr. Jordan opined a high-functioning student like L.P. would not benefit from placement with low-functioning students because it would hinder his ability to make progress. (Doc. 17, Ex. 29, at 126–32). Dr. Bryan Davey, a Board Certified Behavioral Analyst and Director of Behavioral Services for a private day school that serves students with autism, agreed L.P. needed to be with other students at or above his level. (Doc. 17, Ex. 29, at 240–41, 256).

### 5. Sierra

The parent unilaterally enrolled L.P. at Sierra instead of Terramar. When L.P. first enrolled at Sierra, he was enrolled as a part-time student because the parent could not afford the full-time enrollment. (Doc. 17, Ex. 29, at 172). During this time, L.P. did not receive related services of speech or occupational therapy. (Doc. 117, Ex. 30, at 305). Sierra, however, integrated the IEP goals for L.P. into its curriculum. Sierra integrated a goal for L.P. to wait his turn by taking turns on four scooters, throwing a Frisbee with his classmates and shooting hoops. (Doc. 17, Ex. 30, at 273). Sierra integrated the IEP goal for L.P. to follow directions by using a reward system. (*Id.*, at 276). Sierra provided speech support with story retell activities. (*Id.*, at 277). Sierra worked on L.P.'s rhyming goal in group activities with Dr. Seuss books. (*Id.* at 293). Sierra was able to provide all services related to

L.P.'s IEP so long as L.P. was enrolled full time. (Doc. 17, Ex. 30, at 305). Following the ALJ's order for the District to pay L.P.'s enrollment at Sierra, L.P. was enrolled full-time at Sierra. (Doc. 22, ¶ 24).

L.P.'s Sierra teacher, Elaine Dachis, testified L.P. is "very social" and interacts with "all the students," L.P.'s classmates are verbal and L.P. has made progress academically. (Doc. 17, Ex. 30, at 273–75). L.P. is "very good at taking turns" and sharing, has lots of opportunity to socialize and recounts stories to others. (*Id.*). Melinda Pelzel, a certified special education teacher in the District and L.P.'s kindergarten teacher, testified Sierra provided L.P. with a meaningful education. (Doc. 17, Ex. 29, at 113). Dr. Davey testified L.P. is making progress at Sierra, he has similar-functioning peers and Sierra appears to be an appropriate placement. (Doc. 17, Ex. 29, at 255, 259–60). The parent testified L.P. did "great" upon enrolling at Sierra. (*Id.*, at 167–70).[2] L.P. began recognizing more numbers and letters, improving his counting and writing without models. (Doc. 17, Ex. 29, at 167–70). L.P. is helpful in the classroom. (*Id.*, at 170). L.P. has improved his verbalization and talks to other kids. (*Id.*, at 173–74). The parent hopes L.P. will continue to improve academically and transition back into a general education environment. (*Id.*).

### 6. ALJ Findings

The ALJ found the District substantively violated the IDEA by denying L.P. a FAPE when it placed L.P. at Terramar because Terramar did not meet L.P.'s needs set forth in the IEP. The ALJ found the District procedurally violated the IDEA when its management team decided

---

**2.** The parent initially enrolled L.P. at Sierra over the summer then kept him enrolled there when the school year started, rather than moving L.P. to Terramar.

to place L.P. at Terramar without including the parent (or the IEP team) in that decision. In addition, the ALJ decision found "the evidence ... shows that Sierra is an appropriate placement for Student. He has classmates that are appropriate for him to communicate with and he has made progress while there." (Doc. 17, Ex. 28, at 17). As such, the ALJ ordered the District to reimburse the parent for the cost of sending L.P. to Sierra and to place L.P. at Sierra at the District's expense. (*Id.*).

### 7. The Court's Conclusions

Based on all the evidence, the Court agrees with the factual findings by the ALJ. The Court concludes L.P. is able to communicate verbally and must interact with peers at a similar or higher functioning level to meet his IEP goals. The students in the Terramar autism program classroom at Terramar are not verbal. By contrast, L.P. is able to interact with peers at a similar or higher functioning level. Sierra is able to meet the IEP goals.

## IV. Conclusions of Law

### 1. IDEA Requirements

The IDEA requires all children with disabilities be offered a FAPE that meets their individual needs. 20 U.S.C. § 1400(d); 34 C.F.R. § 300.1. These needs include academic, social, health, emotional, communicative, physical and vocational needs. *Seattle Sch. Dist. No. 1 v. B.S.,* 82 F.3d 1493, 1500 (9th Cir.1996) (quotation omitted). A FAPE requires "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 204, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The IDEA requires school districts provide a "basic floor of opportunity" but does not require each child's potential be maximized. *Id.* at 198–200. A child receives a FAPE if the pro-

gram: "(1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities, and (3) is in accord with an individualized educational program." *Park v. Anaheim Union High Sch. Dist.,* 464 F.3d 1025, 1033 (9th Cir.2006) (citing *Capistrano Unified School Dist. v. Wartenberg By and Through Wartenberg,* 59 F.3d 884, 893 (9th Cir.1995)).

When a student is determined eligible for special education services, an IEP team composed of the parent, teachers and other education professionals develop an IEP. The IEP sets forth the student's current levels of educational performance and sets goals to enable the student to make progress in the general curriculum. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320–300.324. The IEP places particular importance on the student's needs resulting from the disability and what services will be provided to meet those needs. A parent has a right to participate in the formulation of an IEP. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a)(1). School districts must notify parents in writing when proposing any changes to the IEP. 20 U.S.C. § 1415(b)(3) and (d).

### 2. Substantive Violation

■ The IEP identifies socialization and communication as an important part of L.P.'s education. The IEP set communication and social/emotional goals that required L.P. to communicate with similar-functioning peers. For example, in the area of communication, the IEP set a goal for L.P. to respond to greetings of peers 8 out of 10 opportunities. The IEP set a goal that, "[d]uring group activities with peers, [L.P.] will request a turn, given an adult prompt, by verbalizing 'May I have a turn?' and/or 'It's my turn please,' 4 out of 5 opportunities." L.P. had a social/emotional goal to increase the number of times he waits his turn to 4 out of 5 times.

Dr. Davey, Dr. Jordan, the District's speech therapist, the District's autism class teacher and L.P.'s kindergarten teacher testified placing L.P. with lower functioning children would not benefit L.P. and L.P. needed to be with other students at or above his level. (Doc. 17, Ex. 29, at 117).

The District argues L.P.'s placement at Terramar can fulfill the IEP goals by, in part, bringing typical students into the classroom for portions of a school day. However, the evidence shows L.P. was isolated, even during lunch, from typical students. This contradicts the IEP. The act of bringing non-disabled students into L.P.'s classroom for short durations of time does not fulfill the IEP. At Terramar, most of L.P.'s day is spent with non-verbal peers with whom he cannot communicate verbally. This falls short of the District's duty to provide a "basic floor of opportunity" and directly violates L.P.'s IEP. *Rowley*, 458 U.S. at 198–200, 102 S.Ct. 3034.

The District cannot meet the IEP goals by placing L.P. in the autism program at Terramar because the students in its autism program are non-verbal. The placement at Terramar denied L.P. a FAPE and was a substantive violation of the IDEA. The Court affirms the ALJ's decision that the District committed a substantive IDEA violation.

### 3. Procedural Violation

■ The ALJ found the District "completely shut Parent out of the initial decision-making as to which special school could best serve Student's needs." However, choosing which school the student will attend is an administrative decision.

"[T]he term 'educational placement' in the regulations refers only to the general type of educational program in which the child is placed." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (citation omitted). " 'Educational placement' refers to the general educational program-such as the classes, individualized attention and additional services a child will receive-rather than the 'bricks and mortar' of the specific school." *Id.* "[T]here is no requirement in the IDEA that the IEP name a specific school location." *Id.* "[A]n IEP's failure to identify a specific school location will not constitute a per se procedural violation of the IDEA." *Id.* at 420. "The location of services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service. For example, is the related service to be provided in the child's regular classroom or resource room?" *Id.* (quoting Assistance to States for the Education of Children with Disabilities and the Early Intervention Program for Infants and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12594 (Mar. 12, 1999)).

As the District argues, "the physical location where a placement will be implemented is an administrative decision made by the DOE, it is not necessarily included in the IEP. The IEP instead sets forth the IEP team's decisions." *N.S. v. Hawaii Dep't of Educ.*, Civ. No. 09–00343 SOM/KSC, 2010 WL 2348664, *8 (D.Haw. June 9, 2010). "[T]he mere fact that the ultimate location of the placement is determined by an administrator in a central office does not violate the procedural mandates of IDEA." *Brad K. v. Bd. of Educ. of the City of Chicago*, 787 F.Supp.2d 734, 743–44 (N.D.Ill.2011). The school district's duty is to provide a FAPE "or place the child in an appropriate setting of the State's choice." *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

L.P. argues the IEP team must determine the physical location of a "special school." L.P. relies on *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir.

2007). In *A.K.,* however, the court "emphasize[d] that we do not hold today that a school district could never offer a FAPE without identifying a particular location at which the special education services are expected to be provided." *A.K.,* 484 F.3d at 682. Instead, the court held "[e]specially in this case, in which the parents had tried in vain to find a local private day school that could meet A.K.'s specialized needs, the offer of an unspecified 'private dy school' was essentially no offer at all." *Id.* In *A.K.,* the concern was whether *any* local school could fulfill the student's IEP. By contrast, here the concern is *which* school is an appropriate placement to fulfill L.P.'s IEP. The parent has not "tried in vain to find a local ... school that could meet [L.P.'s] specialized needs." In addition, *A.K.* has been distinguished by other courts and conflicts with the DOE's comments. *E.g.,* 64 Fed. Reg. 12406, 12594 ("location of services in the context of an IEP generally refers to the type of environment"); *Brad K.,* 787 F.Supp.2d at 743–44 (distinguishing *A.K.*).

L.P. also relies on *Madison Metro. School Dist. v. P.R. ex rel. Teresa R.,* 598 F.Supp.2d 938 (W.D.Wis.2009). In *Madison,* the ALJ found a *substantive* violation of the IDEA. The court recognized educational placement and physical location are two distinct concepts but may overlap because the physical location must be able to fulfill the IEP goals. The court stated, "[t]he physical placement or location determination is an element of the overall educational placement determination." 598 F.Supp.2d at 949–50. Therefore, the court found "the administrative law judge correctly addressed [the student's] physical placement or location as a critical element of his overall educational placement determination." *Id.* at 950. *Madison* does not hold the physical location must be in an IEP.

L.P. also relies on *Student v. Dep't of Educ., State of Hawaii,* DOE–2003–149 (Feb. 14, 2005), in which the student was placed in a community-based instruction program at School "A." When the contract for this program was taken from School "A" and awarded to School "B," the IEP team believed School "B" was the only available option for the student. But the programs at School "A" and School "B" were "entirely different programs." The student had great difficulty coping with change, and the school failed to develop a plan that would meet the student's needs during the transition from School "A" to School "B." The parent was deprived of full participation when the school failed to inform the parent she was permitted to bring the student's therapist or an individual from School "A" to the IEP meeting, and the IEP meeting was held without individuals most knowledgeable about the student. No PWN was issued after the meeting in which the school decided the student would attend "School B." The school violated the "stay-put" provision of the IDEA by moving the student during the course of the administrative complaint. The administrative hearing officer found a substantive and procedural violation and concluded changing student from School "A" to School "B" constituted a "change in placement because of the psychological, emotional, and academic needs of this particular student." OE–2003–149, at 18–19. By contrast, here there was no school closing, the parent was permitted to bring representatives to the IEP meetings, the school issued a PWN, and the school did not violate is distinguishable and does not establish a new rule requiring the IEP to specify the physical location for services.

L.P. also relies on *J.H. v. Coolidge Unif. School Dist.,* OAH 11C–DP–002–ADE an ALJ decision in which the ALJ[3] held the

---

**3.** Judge Bryant was the ALJ in the present case and in *J.H.*

IEP must decide what physical school the student would attend. First, *J.H.* is not binding on this Court. Second, in the subsequent complaint to recover attorney's fees, the student's counsel, who is L.P.'s counsel here, recognized "the rule of law announced—that the decision about which private day school was appropriate was not an administrative 'location' decision but for student's IEP team—is *almost unheard of* across the country. Only one case had been found that was at all 'instructive.'" CV–11–294–PHX–ROS at (Doc. 29, Jan. 30, 2012) (emphasis added). Thus, while citing to *J.H.* to support L.P.'s argument, even L.P.'s counsel recognizes this argument is "almost unheard of." *J.H.* is not persuasive because it is against the weight of authority holding the physical location of the school is an administrative decision.

L.P. argues, and the ALJ found, the District committed a procedural violation by shutting out the parent from the initial decision-making as to which special school could best serve L.P.'s needs. Specifically, L.P. alleges the District management team chose Terramar without the parent's input, gave the parent notice of the decision, scheduled a follow-up meeting to "consider" the parents's input but continued to state L.P. would attend Terramar. Therefore, although the parent fully participated in creating the IEP, L.P. argues the District committed a procedural IDEA violation by not including the parent when choosing the physical school to implement the IEP.

However, "the mere fact that the ultimate location of the placement is determined by an administrator in a central office does not violate the procedural mandates of IDEA." *Brad K.*, 787 F.Supp.2d at 743–44. Therefore, even if the District shut out the parent from choosing the physical school, it makes no difference. Where, as here, the parent has fully participated in developing the IEP plan, the District has administrative authority to choose the physical school without the parent's additional participation. The parent had a procedural right to participate in creating the IEP, and she did so. The parent did not have a procedural right to choose the physical school to implement that IEP. The District did not commit a procedural violation. The Court will reverse the ALJ's decision finding a procedural violation.

### 4. Reimbursement and Placement at Sierra

A parent who enrolls a student with a disability in a private school without consent of the public agency may seek reimbursement for such placement where the public agency had "not made [a] FAPE available to the [student] in a timely manner prior to that enrollment and that the private placement is appropriate." 34 C.F.R. § 300.148(c). Where a hearing officer "agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents." 34 C.F.R. § 300.518(d); *see also* 20 U.S.C. § 1415(j).

The parent placed L.P. at Sierra, where L.P.'s classmates are verbal and L.P. can interact with other students verbally. The parent testified L.P. is progressing. L.P.'s Sierra teacher testified L.P. is "very social" and interacts with students, L.P.'s classmates are verbal and L.P. has made progress academically. L.P.'s kindergarten teacher testified L.P. can obtain a meaningful education at Sierra. Dr. Davey testified L.P. is making progress at Sierra, he has similar-functioning peers and Sierra appears to be an appropriate placement.

The District points to language in the ALJ decision stating Sierra is "more appropriate" and the "best placement." The District argues the ALJ erred by requir-

ing the District to maximize L.P.'s potential, rather than provide a "basic floor of opportunity." Rowley, 458 U.S. at 198–200, 102 S.Ct. 3034.

█ The District is correct that the IDEA does not apply a "more appropriate" or "best placement" standard to "maximize" a student's potential. But the ALJ also found "Terramar *is not appropriate* because of the lack of same- or similar-level classmates." (Doc. 17, Ex. 28, at 18) (emphasis added). The evidence shows Terramar is not appropriate because it cannot meet L.P.'s communication and social/emotional goals set forth in the IEP. As such, the District's decision to place L.P. at Terramar violated the IDEA because it did not comply with the IEP and provide a basic floor of opportunity. *Id.; Park,* 464 F.3d at 1033 (citing *Capistrano,* 59 F.3d at 893).

In addition, the evidence shows Sierra is an appropriate placement for L.P. because Sierra provides L.P. with the same or similar-functioning peers. In light of L.P.'s communication and socialization goals set forth in the IEP, this "permit[s] the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 204, 102 S.Ct. 3034. Therefore, the District shall reimburse the parent for tuition paid at Sierra and place L.P. at Sierra at the District's expense.

Accordingly,

**IT IS ORDERED** the Court affirms the ALJ's decision that the District committed a substantive IDEA violation. The Court reverses the ALJ's decision that the District committed a procedural IDEA violation. The District shall reimburse the parent for costs incurred sending L.P. to Sierra and place L.P. at Sierra at the District's expense.

**IT IS FURTHER ORDERED** Plaintiff's motion for summary judgment (**Doc. 18**) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** Defendant's motion for summary judgment (**Doc. 21**) is **GRANTED IN PART AND DENIED IN PART.** The Clerk shall enter judgment for Defendant Krystal Schripsema, Parent of minor on behalf of L.P.