**D.B. and M.C., individually and on behalf of E.B., Plaintiffs,**

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant.**

**No. 12 Civ. 4833(DLC).**

United States District Court, S.D. New York.

Aug. 19, 2013.

---

Christina D. Thivierge, Thivierge & Rothberg, P.C., New York, NY, for plaintiffs.

Michael A. Cardozo, Eric Porter, New York City Law Department, New York, NY, for defendant.

## OPINION AND ORDER

DENISE COTE, District Judge:

Plaintiffs D.B. and M.C. (the "Parents"), on behalf of their minor child E.B. (the "Student"), bring this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA" or the "Act").[1] The plaintiffs seek review of the April 5, 2012 administrative decision of State Review Officer Justyn P. Bates ("SRO Decision" and "SRO", respectively) annulling the January 10, 2012 decision of Impartial Hearing Officer Mindy G. Wolman ("IHO Decision" and "IHO", respectively) and vacating the IHO's award of reimbursement for the cost of the Student's 2010–2011 educational program. The plaintiffs move for summary judgment, seeking an order reversing the SRO Decision and reinstating the IHO's award of reimbursement. Defendant the New York City Department of Education ("DOE") cross-moves for summary judgment, seeking an order upholding the SRO Decision and dismissing the plaintiffs' complaint. For the reasons set forth below,

---

1. Congress amended the IDEA by enacting the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub.L. No. 108–446, 118 Stat. 2647, which took effect on July 1, 2005. Courts, however, continue to refer to the amended Act as the IDEA. Except where noted, the statutory citations in this Opinion are to the IDEA as amended by the IDEIA.

the DOE's cross-motion for summary judgment is granted and the plaintiffs' motion for summary judgment is denied.

STATUTORY BACKGROUND

■ Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. §§ 1400(d)(1)(A) & (B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009) (discussing the purposes of the IDEA); *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 523, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007) (same). States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(1)(A). To this end, the IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually. 20 U.S.C. § 1414(d)(2)(A). "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *see M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir.2012) (describing the IEP as "[t]he centerpiece of the IDEA's educational delivery system" (citation omitted)).

■ In New York City, the DOE is charged with providing a FAPE to all students with disabilities between the ages of three and twenty-one who reside in the City, and with developing the IEP for these students by convening local Committees on Special Education ("CSE"). N.Y. Educ. L. § 4402. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *M.H.*, 685 F.3d at 224 (citation omitted). The IEP must provide "special education and related services ... tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (citation omitted). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.2009) (citation omitted).

The IDEA requires that parents be provided an opportunity to present a complaint with respect to the identification, evaluation, or placement of their child through the IEP process. 20 U.S.C. § 1415(b)(6)(A). Where the parents believe that the school district has not adequately responded to their complaints, the IDEA requires that they be given an opportunity to pursue their grievances through an "impartial due process hearing." *Id.* § 1415(f)(1)(A). In New York, these hearings are conducted by an IHO, and parties aggrieved by the IHO's decision may appeal to an SRO. *See* N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1) (permitting "any party aggrieved by the findings and decision rendered [by the hearing officer] [to] appeal such findings

and decision to the State educational agency").

■ The IDEA further provides that the final administrative decision may be reviewed "in a district court of the United States" by "bring[ing] a civil action with respect to the complaint." 20 U.S.C. § 1415(i)(2)(A). The district court is empowered to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it. *Id.* § 1415(i)(2)(C); *see also Forest Grove*, 557 U.S. at 239, 129 S.Ct. 2484 (noting that the IDEA "gives courts broad authority to grant 'appropriate' relief"). The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." *Forest Grove*, 557 U.S. at 232, 129 S.Ct. 2484; *see* 20 U.S.C. § 1412(a)(10)(C).

FACTUAL BACKGROUND

The following facts are taken from the parties' submissions and the underlying administrative record, and are undisputed unless otherwise indicated. Plaintiffs D.B. and M.C. are the father and mother, respectively, of the Student. At the onset of the 2010–2011 school year, which is at issue in this case, the Student was twelve years old. The Student is classified as a student with autism and is a "child with a disability" under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i).

**2.** It is unclear from the parties' submissions whether both Parents participated in the CSE meeting, or if only M.C. was present.

A. The CSE Meeting and the Student's IEP

On May 21, 2010, a CSE was convened to develop an IEP for the Student for the 2010–2011 school year. At the time, the Student was unilaterally enrolled in Celebrate the Children ("CTC"), a private special education school. The CSE consisted of M.C., the Student's mother;[2] representatives from the DOE, including Rose Fochetta ("Fochetta"), a certified school psychologist with a masters in educational psychology; Jane O'Connor, a special education teacher who also served as the DOE representative at the CSE; Sharon Wechsler, a general education teacher; Monica Osgood, the CTC Executive Director; and a number of E.B.'s then-current teachers and service providers at CTC, including Elizabeth Kali, E.B.'s occupational therapist; Alyssa Golden, E.B.'s speech therapist; Danielle Dieckmann, E.B.'s physical therapist; and Desmond Lloyd, E.B.'s 1:1 paraprofessional (collectively, "CSE Members").[3]

The CSE Members principally utilized "teacher estimates," information from the Student's then-current teachers and service providers at CTC, to formulate the Student's IEP. The CSE also reviewed a number of additional reports documenting the Student's abilities, including his 2009–2010 IEP, various progress reports from 2010, and a psychological evaluation from 2007. No new tests were conducted. Based on the considered evaluative data, the CSE determined that the Student functioned at a kindergarten level, which was reflected in the Student's IEP. All the CSE Members agreed with the descriptions of the Student's performance levels at the time, including M.C.

**3.** The CSE Members from CTC participated by telephone; all others attended in person.

The CSE also developed E.B.'s educational and behavioral goals and objectives for the 2010–2011 school year. The final IEP contained approximately twenty-six goals and eighty-four short-term objectives, such as rhyming words and identifying sounds, matching shapes and coins, and extending simple patterns. All of the goals and objectives were reviewed at the CSE meeting; each CSE Member, including M.C., agreed on the goals' and objectives' suitability for E.B. and capacity for implementation in a public school.

B. The Student's Recommended Placement for the 2010–2011 School Year

The final IEP for the 2010–2011 school year recommended placing the Student in District 75,[4] in a specialized class with a student-to-teacher-to-paraprofessional ratio of six-to-one-to-one ("6:1:1"), and assigning to E.B. a one-to-one ("1:1") full-time crisis management paraprofessional (together, "6:1:1 + 1:1"). The IEP also recommended that each week the Student receive four thirty-minute sessions of occupational therapy ("OT"), two thirty-minute sessions of physical therapy ("PT"), four thirty-minute sessions of individual speech/language ("S/L") therapy, and two thirty-minute sessions of individual counseling.

The DOE issued a Final Notice of Recommendation ("FNR") to the Parents on June 8, 2010, which briefly described the DOE's proposed classroom program and school placement. The FNR placed the Student at P94M at 188M ("P94"), a special education school at which the Stu-

dent's recommended 6:1:1 + 1:1 program with related services would be implemented. The Parents also received a copy of the IEP via mail.

C. The Student's Unilateral Placement for the 2010–2011 School Year

On June 22, M.C. visited P94 and observed two classrooms that the DOE offered as suitable placements for the Student. The first class was a fifth and sixth grade classroom, which M.C. described as containing students who were "severely impaired and nonverbal." The second class was a third and fourth grade classroom, which M.C. felt contained students functioning at levels that surpassed E.B.'s. M.C. also expressed dissatisfaction with the cafeteria and sensory gym at P94. As a result, M.C. came to believe that the recommended placement was inappropriate for the Student.

By letter dated June 22, M.C. timely rejected the DOE's proposed placement at P94, and stated that the Student would continue his education at CTC. At CTC, the Student was placed in a classroom with a ratio of ten children to one teacher and six classroom paraprofessionals. The Student attended CTC on a limited basis from September through December 2010, while also receiving approximately twenty-two hours of programming per week from the Communication Clinic of Connecticut ("CCC").[5] The Student's program at CCC taught him language skills and functional living skills, including personal grooming, cooking, and cleaning.[6] The Student also

---

4. District 75 is New York City's district of full-time special education schools.

5. The DOE claims that, of the twenty-two hours, the Student traveled over two hours to attend the CCC clinic one day per week, and received CCC services at his home on Mondays and Fridays.

6. The parties disagree as to the amount of academic instruction provided by CCC. The plaintiffs assert that academic content was "embedded" throughout the Student's activities at CCC; the DOE, however, claims that only two hours per week were reserved for educational instruction. The DOE also con-

received supplemental services such as social and emotional therapy, supervision, parent training, communication therapy, S/L therapy, language development therapy, and relationship development intervention contemporaneously with his CCC programming ("Supplemental Services").

The plaintiffs contend that E.B.'s CCC program helped him feel competent and motivated. As a result, in January 2011, the Parents removed E.B. from CTC and placed him in the CCC program full-time. The Student received CCC services at home two days per week and attended the CCC clinic three days per week. The plaintiffs contend that by the end of the 2010–2011 school year, the Student had progressed in all areas and his problem behaviors were significantly reduced.

### D. The IHO Proceedings and Decision

On July 2, 2010, the plaintiffs requested services under pendency and an impartial due process hearing (the "Hearing") to address the DOE's alleged failure to provide the Student a FAPE and to obtain tuition reimbursement for the cost of tuition at CTC and any Supplemental Services provided during the 2010–2011 school year.[7] On October 13, the plaintiffs amended their Due Process Complaint to withdraw their request for pendency services ("Amended Due Process Complaint"). The hearing was conducted before the IHO in eight sessions held between August 2010 and November 2011.

The six-page IHO Decision was rendered on January 10, 2012.[8] The IHO held that the DOE had failed to offer the Student a FAPE for the 2010–2011 school year. In particular, the IHO found that the CSE relied on out-of-date and insufficient evaluative information in developing the IEP, which rendered inaccurate the CSE's assessment of the Student's present levels of performance. The IHO also found that the goals and objectives in the Student's IEP were inappropriate and that many of the stated goals exceeded the Student's then-current skill level, which could result in negative, even aggressive, responses. Finally, the IHO concluded that the DOE did not establish the suitability of the proposed 6:1:1 + 1:1 program for the Student, as it was unclear to the IHO whether the program would have provided the Student with sufficient individualized instruction. The IHO Decision did not address whether the CSE had conducted a Functional Behavioral Assessment ("FBA") or had provided the Student's Behavior Intervention Plan ("BIP") to the Parents, or whether the proposed school placement at P94 was appropriate.

The IHO Decision also found that the unilateral placement of the Student at CCC had been appropriate, and that equitable considerations supported the plaintiffs' claim for tuition reimbursement because the Parents cooperated during the formulation of the Student's IEP and because M.C. visited the Student's recommended placement to determine its appropriateness. As a result, the IHO ordered the DOE to reimburse the Parents for the Student's tuition at CCC, as well as for Supplemental Services rendered from July 1, 2010 through June 30, 2011.

### E. The SRO Appeal and Decision

The DOE appealed the IHO Decision on February 3, 2012. The plaintiffs did not

---

tends that CCC educational instruction was primarily 1:1.

**7.** Upon the Student's transfer to CCC, the parties consented to amend the relief sought from the cost of tuition at CTC, as initially

requested, to reimbursement for the cost of tuition at CCC and the additional services the Student received.

**8.** The IHO issued a Corrected Findings of Fact and Decision on January 11, 2012.

cross-appeal any aspect of the IHO Decision. The SRO reviewed the Student's IEP and the documentary and testimonial evidence introduced at the Hearing. The twenty-one page SRO Decision dated April 5, 2012 reversed the IHO Decision and determined that the DOE had offered the Student a FAPE for the 2010–2011 school year. The SRO determined that the IHO had erred in finding that the DOE's failure to conduct a current reevaluation of the Student was a procedural defect and that the evaluative data on which the CSE Members based the IEP was insufficient. The SRO carefully examined both the "teacher estimates" and the additional documentation that had been examined by the CSE in formulating the Student's IEP and found that, together, they formed a sufficient basis for the CSE to assess accurately the Student's present skill levels.

The SRO Decision also held that the IHO's analysis of the goals and objectives contained in the Student's IEP was poorly reasoned, since it *inter alia* offered no specifics as to which goals were unsuited to the Student. After a careful review of the Hearing record, the SRO found the goals and objectives were appropriate, overturned the IHO's finding that the recommended placement was improper, and approved the 6:1:1 + 1:1 program that the IEP had proposed. The SRO therefore held that the Hearing record supported findings that the IEP was well-suited to meet the Student's needs and that the IHO erred in determining that the DOE had failed to provide the Student a FAPE. As a result, the SRO denied the Parents' request for tuition reimbursement.

Because the plaintiffs did not file a cross-appeal, the SRO limited the scope of his review to those issues that the IHO Decision had addressed: the sufficiency of the evaluative data used to formulate the Student's IEP, the accuracy of the present levels of performance in the IEP, the adequacy of the goals and objectives in the IEP, and the adequacy of the CSE's recommendation to place the student in a 6:1:1 + 1:1 special class. As the SRO found that the DOE had provided the Student a FAPE for the 2010–2011 school year, the SRO did not continue his analysis to consider the appropriateness of the Student's unilateral placement at CTC and CCC, or equitable considerations.

## F. The District Court Proceedings

On June 20, 2012, the plaintiffs timely filed the complaint in this action seeking review of the SRO Decision. On December 14, the plaintiffs filed their motion for summary judgment, and on January 18, 2013, the DOE filed its cross-motion for summary judgment.

## LEGAL STANDARD

Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 n. 3 (2d Cir.2005) (citation omitted). As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact." *Id.* at 83 n. 3. Rather, the court conducts an "independent" review of the administrative record, basing its decision on the "preponderance of the evidence." *Bd. of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (citation omitted). Summary judgment thereby "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." *Lillbask*, 397 F.3d at 83 n. 3 (citation omitted).

Nevertheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," *T.Y. & K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir.2009) (citation omitted), and "courts may not substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (citation omitted). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (citation omitted). "The deference paid to administrative proceedings is particularly warranted where ... the district court's decision [is] based solely on the administrative record." *A.C. & M.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir.2009). The court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* (citation omitted). Judicial deference to the administrative proceedings "is particularly appropriate when the state officer's review has been thorough and careful[.]" *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir.2012) (citation omitted). In cases where "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" *A.C.*, 553 F.3d at 171 (citation omitted).

When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state. *See Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (*"Burlington"*); *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (*"Carter"*). Under the *Burlington–Carter* test for tuition reimbursement, plaintiffs are entitled to reimbursement of private school tuition if (1) the IEP was not "reasonably calculated to enable the child to receive educational benefits," (2) "the private schooling obtained by the parents is appropriate to the child's needs," and (3) equitable considerations support the plaintiffs' claim. *T.Y.*, 584 F.3d at 417 (citation omitted); *see also Forest Grove*, 557 U.S. at 246–47, 129 S.Ct. 2484 ("Parents are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act ... [a]nd even then courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant ...." (citation omitted)).

## DISCUSSION

While the IHO and SRO reached conflicting conclusions as to whether the DOE offered the Student a FAPE, the SRO Decision is careful and detailed in its analysis of the plaintiffs' claims and, accordingly, warrants deference. The IHO presented little, if any, analysis of the administrative record and controlling law to support her summary assertions that the DOE failed to meet its burden in showing that the Student's IEP was procedurally and substantively appropriate. By contrast, as described in greater detail below, the SRO Decision examined the full evidentiary record and detailed its careful reasoning in deciding that the IHO had erred.

### A. Scope of Review

As a preliminary matter, the DOE contends that the plaintiffs are barred

from litigating several issues raised in their summary judgment motion because the plaintiffs either failed to mention them in the Amended Due Process Complaint or failed to raise them in a cross-appeal from the IHO Decision to the SRO. First, the plaintiffs seek to challenge (i) the DOE's failure to conduct an FBA for the Student[9] and (ii) the substantive adequacy of the BIP as part of their argument that the Student's IEP was procedurally and substantively deficient. These two issues, however, were not raised in plaintiffs' initial or amended Due Process Complaints. The scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' Amended Due Process Complaint or agreed to by the defendant. 20 U.S.C. § 1415(f)(3)(B); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir.2008) ("Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter jurisdiction."). The DOE has made no such agreement here. The Parents may not now rely on objections that were not included in their Amended Due Process Complaint, and the Court thus will not consider those challenges here.

The plaintiffs also seek in their summary judgment motion to challenge (i) the DOE's failure to include a BIP for the Student in the IEP and (ii) the appropriateness of the DOE's proposed placement at P94. While there is no dispute that these two issues were properly raised in the plaintiffs' Amended Due Process Complaint, the DOE argues that the plaintiffs have waived their right to rely on these arguments at this stage because the IHO did not address them in the IHO Decision, and the plaintiffs did not cross-appeal the

IHO's non-consideration of the issues to the SRO.

 The plaintiffs' claims regarding the absence of a BIP and the proposed P94 school placement are properly raised here. Federal and state law require parties in IDEA proceedings to appeal only to the extent that they are "aggrieved" by all or a portion of an IHO's decision. *See* 20 U.S.C. § 1415(g)(1); N.Y. Comp.Codes R. & Regs. tit. 8, § 200.5(k)(1). Parties that receive their requested relief in proceedings are not "aggrieved." *See Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir.1988); *see, e.g., J.F. v. New York City Dep't of Educ.*, No. 12 Civ. 2184(KBF), 2012 WL 5984915, at *9 (S.D.N.Y. Nov. 27, 2012) (noting that the term "aggrieved" is interpreted by its ordinary meaning, which implies actual harm or injury). As such, parties that succeed in an IDEA proceeding before an IHO are under no obligation to appeal any aspect of the hearing officer's favorable decision.

 Here, the IHO made no findings regarding the DOE's development of a BIP or its inclusion in the Student's IEP, or regarding the recommended school placement at P94. Instead, the IHO determined that the DOE failed to offer the Student a FAPE based on other considerations, including the inaccuracy of the DOE's assessment of E.B.'s skill levels and the inappropriateness of a 6:1:1 classroom for the Student. Because the IHO ultimately ruled in favor of the plaintiffs and awarded them reimbursement, the plaintiffs were not aggrieved by the IHO Decision. As a non-aggrieved party, the plaintiffs' failure to cross-appeal issues properly raised in their Amended Due Process Complaint but never reached by the IHO

---

**9.** As previously described, an FBA provides detailed information about a student's problem behaviors.

does not constitute a waiver of their right to pursue those issues here.

In any event, while the SRO indicated that his review was limited to only those issues addressed by the IHO and appealed by the DOE, he did not wholly exclude the plaintiffs' arguments regarding the BIP and P94 in his analysis.[10] The SRO's consideration of these issues further supports the finding that these issues are ripe for review.

## B. The IEP Did Not Suffer From Procedural Defects that Denied the Student a FAPE.

■■■■ The first consideration in determining whether the Parents are entitled to tuition reimbursement is to ask "whether the state has complied with the procedures set forth in the IDEA" and "whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005) (citation omitted). This "initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (citation omitted). At the same time, "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir.2003). Rather, a procedural violation will constitute a denial of a FAPE "only if the procedural inadequacies (i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (iii) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

### 1. Sufficiency of Evaluative Data

■■■■ The first alleged procedural deficiency of the Student's IEP is that the CSE had insufficient information to evaluate accurately the Student's present levels of performance. In particular, the plaintiffs contend that the CSE improperly considered outdated formal testing and relied on inadequate "teacher estimates" in the development of the IEP.

Federal and state regulations require a district to conduct an evaluation of students receiving special education or related services at least once every three years unless the parents and the district agree otherwise. *See* 20 U.S.C. § 1414(a)(2)(B). In developing an IEP, a CSE is directed to "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." *Id.* § 1414(c)(1)(A). "[O]n the basis of that review," a CSE must then "identify what additional data, if any, are needed to determine," among other things, "the present levels of academic achievement" of a student. *Id.* § 1414(c)(1)(B). Any additional assessments need only be conducted if found necessary to fill in gaps in the initial

---

**10.** Although not determinative of the SRO's finding that the DOE provided the Student a FAPE, the SRO Decision describes in a footnote that "[t]he hearing record reflects that the May 2010 CSE also developed the [S]tudent's BIP," and considers both the services provided for the Student at P94 and the Hearing testimony of a P94 special education teacher.

review of existing evaluation data. *Id.* § 1414(c)(2).

The IHO and SRO both directly addressed this alleged deficiency. The IHO found that the DOE had failed to conduct its mandatory evaluation of the Student within the past three years, and that the "teacher estimates" on which the CSE relied, "without more, do not form a sufficient and appropriate basis for developing an[ ] IEP." The SRO carefully considered the full evidentiary record in determining that the IHO's findings were in error on this issue. The SRO first concluded that the fact that the DOE failed to conduct a current reevaluation of the Student did not deny the Student a FAPE. He then found that the CSE had sufficient information to formulate the Student's present levels of performance in the IEP. In making this determination, the SRO engaged in a thorough review of each of the reports and evaluations that the CSE used to assess the Student's abilities, in addition to the "teacher estimates," and considered in detail any conflicting testimony presented at the hearing.

The SRO's careful assessment of both the record and controlling law is entitled to deference. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998). The SRO was correct in finding that, in creating the Student's IEP, the CSE relied on "teacher estimates," information from the Student's then-current teachers and service providers at CTC, as well as a number of other reports evaluating E.B.'s abilities as recently as March and May 2010. These additional materials included E.B.'s IEP from the previous 2009–2010 school year; a 2010 OT report; a 2010 mental health progress report; a 2010 formal progress report from CTC; and the last formal DOE evaluation of the Student that was conducted in 2007. These materials described in detail the Student's read-ing, writing, and math functioning levels. They were reviewed and discussed at the CSE meeting by staff from CTC, the Student's 1:1 paraprofessional, speech, physical, and occupational therapists, Fochetta, and M.C. herself.

The SRO correctly found that this evaluative data was more than sufficient for the CSE properly to develop the Student's IEP and did not deny the Student a FAPE. There is no evidence in the record that any CSE Member, including M.C., believed that this information was inadequate at the time or otherwise needed to be supplemented by additional evaluations or any new formal testing. Not even M.C. testified that the information she and the CTC supplied failed to provide a sufficient basis for the CSE properly to determine the Student's level of academic achievement. The plaintiffs also provide no support for their assertion that the teacher estimates were insufficient and served as a "shortcut" to determining the Student's present level of academic performance, citing only to the IDEA's requirement that a district must use a "variety of assessment tools and strategies" in developing a student's IEP. 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(1)(ii).

While it is undisputed that the DOE had not evaluated the Student since February 2007, the SRO also correctly found that the failure of the DOE to conduct the statutorily-mandated psychological reevaluation of the Student does not render the IEP procedurally defective in this case. The purpose of the formal evaluation is to "provide relevant information that directly assists persons in determining the educational needs of the student." 8 N.Y.C.R.R. 200.4(b)(6)(i)(d)(xi). The information provided at the CSE meeting more than fulfilled that purpose, and there is no evidence that the absence of any post–2007 formal DOE evaluation impeded the Stu-

dent's right to a FAPE or denied the Student or Parents any educational or procedural opportunities. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *Grim*, 346 F.3d at 381.[11] Moreover, the statute clearly indicates that a CSE's evaluation of a student's abilities should never rely on "any single measure or assessment as the sole criterion for determining ... an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). By the same token, where, as here, the CSE relied on a number of sufficient evaluations, reports, and observations in assessing the Student's skill levels, the absence of one "single measure" should not itself render an IEP invalid. In this case, the preponderance of the evidence indicates that the CSE had sufficient and accurate information to understand the Student's present levels of performance in preparing the IEP.

2. The Student's Levels of Performance

■ The plaintiffs next allege that the IEP's determination that the Student performed at a kindergarten level was inaccurate. The Parents claim that the Student was functioning at a lower, pre-kindergarten level ("pre-K") at the time, pointing to an evaluation conducted after the CSE meeting by Dr. Nancy Schwartz ("N. Schwartz"), the director of CCC, which placed the Student at a two-year old skill level,[12] and the Hearing testimony of N. Schwartz and Dr. Caley Schwartz ("C. Schwartz"), a clinical psychologist who had worked with the Student, to support their contention.

The IHO and SRO both addressed this argument directly. Relying solely on her determination that the evaluative data on which the CSE based its assessment of the Student's abilities was insufficient and inappropriate, the IHO broadly found that the "IEP did not, therefore, accurately set forth E.B.'s present levels of performance and learning characteristics." The SRO overturned the IHO's conclusion after making specific findings with respect to N. Schwartz's testimony and the sufficiency of the evaluative data, and ultimately determined that nothing on the record renders the Student's IEP invalid or inaccurate.

This Court has already found that the extensive documentation and verbal input that the CSE Members used to formulate the Student's IEP provided the DOE with more than enough current information to assess accurately the Student's skill levels. There is also evidence that every CSE Member, including M.C., participated in and contributed to the discussion of, and ultimately agreed with, the descriptions of the Student's academic skills at the time.[13]

The SRO Decision also warrants deference here. The SRO extensively engaged with the evidence in the administrative record regarding E.B.'s levels of performance, and reasonably cast doubt on the methodology N. Schwartz used in her post-CSE meeting evaluation of the Student. The SRO found that "it is unclear why [N. Schwartz] began her assessment of the [S]tudent at an eight year old level," and that when faced with testing at that higher level, it was thus "not surprising that the [S]tudent responded by demonstrating in-

---

11. It is therefore also of no consequence whether the DOE could have tested the Student at any time since 2007.

12. N. Schwartz first evaluated the Student at the end of July 2010; the CSE meeting occurred on May 21, 2010.

13. While M.C. testified at the Hearing that she did not understand what a "kindergarten level" meant, she nonetheless agreed with the descriptions of the Student's academic and functional skill levels at the time of the CSE meeting.

appropriate behaviors." He further attributed N. Schwartz's disagreement with the academic performance levels set forth in the Student's IEP to a "genuine difference of opinion regarding the *best* way to instruct th[e] [S]tudent and address his complex needs," and reasonably held that it was appropriate to rely on the information available to the CSE Members at the CSE meeting in describing the Student's levels of academic achievement and functional performance.

The plaintiffs assert that the Court should not defer to the SRO Decision because the SRO improperly found that there was little difference between assessing the Student at a pre-K versus a kindergarten level. The SRO, however, neither assumed nor found that pre-K and kindergarten levels are indistinguishable in general.

Instead, the SRO Decision reasoned that any difference in characterizing the Student at a pre-K or kindergarten level on the Student's IEP would not affect the IEP's utility in properly guiding appropriate instruction for the Student and did not deny the Student a FAPE. The SRO based this finding on a consideration of the sufficiency of the information provided at the CSE Meeting, as well as the IEP's allowance for teacher support, the Student's age, and the severity of his disability. The SRO Decision also explored N. Schwartz's testimony and found that N. Schwartz evaluated and addressed needs similar to those reflected in the Student's IEP. In light of these factors, the SRO determined that either characterization would afford the Student the same type of academic instruction in this case. Nothing calls into question the SRO's carefully considered determination that the Student's level was not incorrectly reported. Nor did the CSE Members in this case arbitrarily assign or change the Student's performance

levels based on information unrelated to the CSE's assessment of the Student or ever come to determine that the kindergarten level was inaccurate. *See M.H.*, 685 F.3d at 248. The SRO was thus correct in determining that the Student's classification at a kindergarten level does not render the IEP insufficient.

### 3. Absence of the BIP

■■■ The plaintiffs also allege that the Student's IEP was procedurally inadequate because it did not include a BIP, or Behavior Intervention Plan. A BIP typically consists of four sections in which the CSE describes: (1) the behaviors that interfere with the student's learning, (2) the behavioral changes expected of the student, (3) the strategies used to help the student make those changes, and (4) the supports employed to help the student make those changes. The plaintiffs claim that they did not receive a copy of the Student's proposed BIP in the IEP that was sent to them, and that they only received it during the Hearing. They contend that this belated receipt demonstrates a denial of a FAPE. This alleged deficiency was not addressed by the IHO. As previously noted, the SRO did not address the plaintiffs' argument regarding when they received the BIP, but did assert in a footnote that the CSE had developed a BIP for the Student.

A BIP must be developed when "the student exhibits persistent behaviors that impede his or her learning or that of others." N.Y. Comp.Codes R. & Regs. tit. 8 § 200.22(b); *see R.E.*, 694 F.3d at 190. As the SRO indicated, the record is replete with evidence that a BIP was properly developed at the CSE meeting, and contained strategies outlining how to deal with the Student's problem behaviors. Fochetta testified that a BIP was drafted by hand at the CSE meeting and then later included in the Student's IEP. When asked at

the Hearing whether it was clear that a BIP was discussed at the CSE meeting, Fochetta testified that, "I can't understand how ... there would be any confusion with regard to that." While M.C. did not recall specifically discussing a "BIP" at the CSE meeting, she nevertheless agreed that the CSE Members discussed E.B.'s behaviors and how they were best approached at school and decided "what services [E.B.] would need and what—would be appropriate."

In any event, whether or not the plaintiffs only received a copy of the BIP at the Hearing, there is no indication that this denied the Student a FAPE. It is clear that M.C. fully participated in the CSE's decision-making process to find strategies that would address the Student's problem behaviors to include in the IEP.[14] There is also no evidence that the timing of the Parents' receipt of the BIP that had been developed with their input interfered in any way with the Parents' involvement in the CSE or with the Student's ability to receive educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

In sum, given M.C.'s significant involvement in developing the Student's special education plans and the sufficiency of the information before the CSE to assess the Student's academic, functional, and behavioral capacities, the IEP satisfied the IDEA's procedural obligations. *See Cerra,* 427 F.3d at 193–94. There is no indication that the Parents were denied any meaningful opportunity to participate in the formulation of E.B.'s IEP or that the CSE's process of developing the IEP in any way denied E.B. educational or other benefits.

**C. The IEP Was Not Substantively Inadequate Under the IDEA.**

 "The purpose of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d at 130 (citation omitted). Therefore, the IDEA does not require that an IEP furnish "every special service necessary to maximize each handicapped child's potential." *Rowley,* 458 U.S. at 199, 102 S.Ct. 3034. Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P.,* 554 F.3d at 254 (citation omitted); *see also Cerra,* 427 F.3d at 195. A school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Walczak,* 142 F.3d at 122 (citations omitted).

 ▪ "[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *T.Y.,* 584 F.3d at 418 (citation omitted). "[I]n order for the district court to conduct an independent review of the sufficiency of

---

14. In this way, the plaintiffs' attempt to analogize any delayed receipt of the BIP to "retrospective testimony" addressing services that could have been provided to the Student beyond what was written in the Student's IEP, which a court may not consider at this stage, *see R.E.,* 694 F.3d at 185–86, is not persuasive. The record here indicates that a BIP was developed at the CSE based on input from all CSE Members, and that any BIP that the Parents received for the first time at the Hearing was thus neither intended to "overcome deficiencies in the IEP" nor materially different from information contained in the IEP. *See id.* at 185.

an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir.2007) (citation omitted). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382.

■ The Student's IEP satisfies all the requirements under the IDEA and the law of this Circuit. The record supports a finding that the DOE properly tailored the Student's IEP to suit his needs, and was based on and incorporated the detailed evaluations, observations, and other information provided by the Parents and other CSE Members, and as a result, an educational benefit would have been conferred. The plaintiffs challenge the substantive adequacy of the IEP's goals and objectives, as well as the 6:1:1 + 1:1 program and its implementation at P94, and argue that the IEP therefore is not reasonably calculated to enable the Student to receive educational benefits. Their arguments, however, are unavailing and will be addressed in turn.

### 1. IEP Goals and Objectives

While the plaintiffs fail to identify the specific goals included in the Student's IEP that they consider to be inappropriate, the plaintiffs nonetheless allege that the proposed goals were not functional, were too challenging for the Student, and did not contain appropriate "mastery criteria," which would have aimed to increase E.B.'s independence. The IHO and SRO both directly considered this alleged substantive deficiency.

The IHO did not provide any detailed explanation for her findings, but instead baldly asserted that the DOE's testimony was insufficient to establish that the goals contained in the Student's IEP were appropriate. The IHO also determined that many of the goals were above the Student's then-current skill level, but did not indicate which goals she found to be too advanced. The SRO, by contrast, reviewed in detail several of the goals and objectives set forth in the Student's IEP, as well as the broader skill areas they sought to improve. The SRO Decision considered the underlying focus of the IEP's goals and objectives, and their relation to the record evidence provided by the Student's then-current teachers and related service providers at CTC, and found that they emphasized improving academic and social skills. These skills had similarly been the emphasis of the Student's instruction at CTC.

The SRO found that the program at CCC was focused on a different set of underlying principles aimed at improving the Student's functional living skills. The SRO concluded that just because "the focus of intervention at CCC differed from that employed by CTC and appropriately utilized by the May 2010 CSE does not result in a denial of FAPE." In light of all these considerations, the SRO found that the goals and objectives described in the Student's IEP were appropriate.

The SRO's careful assessment of the record is entitled to deference. The IDEA provides that an IEP must have

A statement of measurable annual goals, including academic and functional goals, designed to—

(aa) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(bb) Meet each of the child's other educational needs that result from the child's disability.

20 U.S.C. § 1414(d)(1)(A)(i)(II). The SRO was correct in determining that those requirements were met. The hearing record reflects the appropriateness of the twenty-six goals and eighty-four short-term objectives contained in the IEP. There is substantial evidence that these goals and objectives were specifically developed to address the Student's particular needs. While some of the goals and objectives were prepared in advance of the meeting by the Student's then-current teachers and service providers, some of the goals were developed at the CSE meeting, and all of the goals were reviewed at the meeting by all CSE Members, including M.C., who agreed on their suitability for E.B. and capacity for implementation in a public school. M.C. specifically contributed to their development, requesting an additional self-help annual goal, which was indeed added to the IEP.

The SRO also considered that while N. Schwartz claimed that some of the IEP's stated goals may have been too challenging for the Student, she agreed with many of the basic principles the goals sought to target, including improving the Student's handwriting and functional skills, and ability to match coins and identify letters. N. Schwartz also acknowledged that, in her evaluations of the Student, the Student had at times correctly demonstrated skills targeted in the IEP's goals and objectives, including 1:1 correspondence, counting to ten, and functioning at a "reading readiness" level—all of which were included in the IEP. The SRO thus reasonably concluded that the goals and objectives were properly tailored to benefit the Student.[15]

The plaintiffs also question the appropriateness of the proposed goals and objectives' mastery criteria. They argue that the goals should have sought to target the Student's independence, which would help E.B. to master the proposed goals on his own, rather than require the use of moderate support, including visual or verbal prompting, which the plaintiffs believe hinder the Student's development. The SRO, however, reasonably found that it was not inappropriate for the IEP to include supports within the goals and objectives. The SRO Decision carefully considered testimony from the Hearing that suggested that the amount of support included in the Student's goals could affect E.B.'s ability to perform functional skills on his own. He ultimately reasoned, however, that the supports were important for the Student's academic and social skill development, which the Student's CTC program had stressed as important for the Student, and had served as the foundation for the CSE's development of the IEP. Based on the Student's present abilities, the IEP's reasonable goals, and evidence demonstrating that supports would allow the Student to advance in academic and social realms, the SRO's conclusion as to the sufficiency of the IEP's goals and objectives warrants deference.

### 2. 6:1:1 + 1:1 Program

The plaintiffs next argue that the 6:1:1 + 1:1 program recommended for the Student was not appropriate because the Student required more individualized instruction in order to make gains. Both the IHO and SRO discussed this challenge to the IEP's substantive sufficiency. The

15. The plaintiffs' claims that the goals and objectives are too advanced because they were based on an incorrect assessment of the Student's present level of performance are also not persuasive in light of the Court's prior determination that the IEP appropriately described the Student to function at a kindergarten level.

IHO, however, did no more than summarily state that "[t]he 6:1:1 program would not have provided [the Student] with the level of [individualized] support that he needed." The SRO, however, found that the IHO had erred by ignoring evidence of the instructional value of the recommended 1:1 crisis management paraprofessional and other related services that formed a part of the Student's proposed 6:1:1 program. The SRO carefully reviewed the hearing record, state regulations, and the private school programs in which the Student was unilaterally enrolled immediately prior to this dispute.[16] He noted that the CSE Members had considered and rejected placement of the Student in a 12:1:1, 8:1:1, or 6:1:1 special class without a 1:1 crisis management paraprofessional, after finding that these classrooms were "insufficiently supportive" for E.B. Based on these and other considerations, the SRO approved the IEP's 6:1:1 special class with the added supports of a 1:1 paraprofessional.

Both the law and the record support deference to the SRO Decision. State regulations provide that a 6:1:1 program is specifically designed and recommended for students "requiring a high degree of individualized attention and intervention." 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a). In addition, in making this recommendation, the CSE Members specifically considered that the Student required a "smaller student-to-teacher ratio in order to make progress and achieve his IEP goals." The recommended program included a 1:1 crisis management paraprofessional, as well as additional services in which the Student would receive 1:1 attention, such as OT, PT, S/L therapy, and individual counseling.

The plaintiffs claim that the SRO Decision improperly discounts the testimony of their witnesses, N. Schwartz and C.

Schwartz, with respect to the 6:1:1 program in favor of Fochetta's testimony. The plaintiffs claim that testimony from the Hearing suggests that Fochetta was unfamiliar with the recommended program and the Student, and that her testimony should not have been viewed as credible.

The record, however, demonstrates that Fochetta had sufficient knowledge to assist in the recommendation process during the CSE meeting, and thus that it was proper for the SRO to find her testimony credible. Fochetta testified that she was unfamiliar with the specific 6:1:1 program at P94, but that CSE teams make recommendations about "program[s] broadly ... not the specific school." This statement does not demonstrate any lack of knowledge about 6:1:1 programs generally. Moreover, Fochetta demonstrated knowledge of the benefits of 6:1:1 classrooms, testifying that she and the CSE Members felt that the socialization aspect of a 6:1:1 class was particularly important given E.B.'s significantly delayed social functioning.

In addition, as described above, the CSE Members used written documentation as well as verbal input from the CTC staff and M.C. during the CSE meeting to assess appropriate programs for E.B. While it is true that Fochetta never observed the Student, the CSE Members had ample information to make an appropriate recommendation for the Student designed to address his academic, language, physical, social, and emotional needs. In fact, the hearing record indicates that no one at the CSE meeting disagreed with the recommendation of a 6:1:1 program with 1:1 paraprofessional support at the time, including M.C.

### 3. P94 Placement

Finally, the plaintiffs contest the DOE's proposed placement at P94, the school at

---

**16.** These classrooms included an 8:1:4 ratio and a 10:1:6 ratio.

which the Student's recommended 6:1:1 + 1:1 program would have been implemented. The IHO did not discuss this issue. While the SRO also did not specifically rule on the appropriateness of P94, the SRO considered the Hearing record and described several benefits conferred by the assigned school, including that P94 "provided differentiated instruction according to the needs of a particular student, and that the paraprofessionals in the classroom collaborated with the special education teacher to assist in implementing lesson plans, collecting data on student progress, and promoting generalization." The SRO also noted that the evidence demonstrated that P94 "implemented a daily positive reinforcement system" that would improve students' "emotional literacy" and social skills, and would be able to offer the program modifications and related services recommended in the Student's IEP.

■■■■ The plaintiffs' principal concern is that P94 does not offer a classroom with instruction that matches the Student's functioning levels. During M.C.'s visit to the school, she observed two classrooms, as well as the cafeteria and sensory gym. M.C. described one of the classrooms as consisting of "severely impaired and non-verbal" students functioning below E.B.'s levels, and the other class of students as functioning at higher levels than E.B. That the classrooms and other students that M.C. observed at P94 do not exactly match E.B.'s level of performance, however, does not render the placement inappropriate under the IDEA. A proposed classroom composed of students with differing "intellectual, social, and behavioral needs" can still be adequate so long as "a core group was operating at an intellectual level suffi-

ciently comparable to [the Student's] to permit [him] to continue making academic progress." *Walczak*, 142 F.3d at 133–34. Uniformity of needs is not required. *Id.* Moreover, the IDEA does not require school districts to provide the best possible placement, only an appropriate education which allows the child to receive a meaningful educational benefit. *See Rowley*, 458 U.S. at 199, 102 S.Ct. 3034; *T.P.*, 554 F.3d at 254.

Here, the record indicates that a P94 classroom taught by Maria Maraventano ("Maraventano"), a certified special education teacher who holds a master's degree in special education, would have been appropriate for the Student. The class consisted at the time of five autistic students, aged twelve to thirteen, with functioning levels ranging from pre-primer to fourth grade. At least one of these students would have operated at a level "sufficiently comparable" to that which the IEP described as the Student's abilities. The SRO also considered the Hearing record, which supports a finding that Maraventano adapts her lesson plans to the unique abilities and challenges of each student, and places her students into smaller groups for instruction based on their unique functioning levels. Maraventano testified at the Hearing that her classroom was equipped with its own sensory area, and that another teacher, also certified in special education, assisted in her classroom, as did another classroom paraprofessional with fourteen years of experience. Such differentiated instruction is conducive to conferring an educational benefit, and the Student, accordingly, would have been appropriately placed in this classroom.[17]

---

17. Whether M.C. actually observed this particular classroom is irrelevant to this determination. The record provides sufficient evidentiary support of the DOE's appropriate placement, and indicates that Maraventano's class was registered and had space available for the Student at the beginning of the 2010–2011 school year.

The plaintiffs finally contend that the DOE failed to meet its burden in demonstrating that the P94 placement was appropriate. In particular, the Parents question whether Maraventano in fact teaches a 6:1:1 classroom regularly, and argue that the DOE presented imprecise evidence from individuals with limited knowledge of the Student and the specifics of the proposed placement. These arguments fail, for several reasons.

First, Maraventano testified that she had taught a 6:1:1 class every summer, even if the summer program ran somewhat differently than during the academic year. Maraventano also indicated that, while she did not participate at the CSE in formulating the Student's IEP, she "carefully addresses everything mandated in each student's IEP[,]" so that she can properly tailor her teaching methods. Nothing in the record indicates that Maraventano's testimony is not credible.

In addition, the fact that Maraventano did not know the total number of students enrolled in P94 or whether the school had a sensory gym does not render the DOE's recommended placement inappropriate; nor does the fact that Fochetta could not list the precise level of training obtained by the classroom paraprofessionals or individual crisis management paraprofessional at P94. Fochetta reasonably indicated that there was variability with respect to the paraprofessionals' training and she should not be expected to have that information committed to memory. Nothing in the record suggests that the fact that the DOE did not include every detail of the proposed placement at P94 impeded the Student's ability to progress and did not render the IEP inadequate.[18] Accordingly, the P94 school placement, as well as the IEP's goals and objectives, and the 6:1:1 program with a 1:1 paraprofessional, were sufficiently tailored to confer an educational benefit on the Student, and were not substantively inadequate.

### D. The Parents' Unilateral Placement and Equitable Considerations

This Opinion has found that the SRO correctly determined that the DOE provided the Student a FAPE, and that the Parents are not entitled to reimbursement for the Student's tuition at CCC, or for Supplemental Services rendered from July 1, 2010 through June 30, 2011. This Opinion therefore "need not reach the issues whether the additional services provided by the parents were appropriate, or whether equitable considerations affect relief." *T.P.*, 554 F.3d at 254. In any event, the DOE would prevail on these issues as well.

■ The Parents have not demonstrated that the Student's unilateral placement at CCC is appropriate. The record indicates that the Student's unilateral placement at CCC is overly restrictive, and only allows the Student to interact with peers for approximately three of the thirty-five hours of CCC services he receives per week. CCC provides services to the Student at his home, where there is no opportunity for socialization, for two days per week, and it also requires over two hours of travel on the three days per week that he does attend the clinic. The IEP reflects the Student's need for social interaction, which CCC fails to provide. CCC also does not offer OT or PT services, both of which are recommended in the Student's IEP. In addition, although the Parents have asserted that the Student progressed in all areas while attending CCC, the record indicates that CCC provides

---

**18.** The plaintiffs' assertion that "a paraprofessional would not have sufficient training to address E.B.'s behaviors" is not supported by any evidence on the record.

very little academic instruction, which was a primary and reasonable focus of the Student's IEP. The plaintiffs also have not met their burden of establishing that the equities favor reimbursement.

## CONCLUSION

The DOE's January 18, 2013 cross-motion for summary judgment is granted and the plaintiffs' December 14, 2012 motion for summary judgment is denied. The Clerk of Court shall enter judgment for the defendant and close this case.

SO ORDERED.