v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, Defendant.**

No. 13 Civ. 01131 (AJN).

United States District Court, S.D. New York.

Signed March 26, 2014.

422

Jesse Cole Cutler, Skyer, Castro, Foley & Gersten, New York, NY, for Plaintiffs.

David Alan Rosinus, Jr., New York City Law Department, New York, NY, for Defendant.

*MEMORANDUM & ORDER*

ALISON J. NATHAN, District Judge:

Plaintiffs R.B. and M.L.B. bring this action, individually and on behalf of their minor child D.B., against Defendant New York City Department of Education ("DOE" or "Department"), seeking review of the October 17, 2012, administrative decision of State Review Officer ("SRO") Justyn P. Bates, which affirmed the decision of Impartial Hearing Officer ("IHO") Christine Moore that the individualized education plan ("IEP") developed for D.B. by the DOE was sufficient to provide D.B. with the free appropriate public education ("FAPE") to which he is entitled under the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs challenge this decision and seek reimbursement for the cost of his enrollment in the Rebecca School, a private school in which they unilaterally opted to enroll D.B. for the 2011–12 school year. The parties have filed cross motions for summary judgment. Dkt. Nos. 11, 15. For the reasons that follow, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiffs' motion for the same.

## I. BACKGROUND

D.B's educational history is described in *R.B. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3763(AJN), 2013 WL 5438605 (S.D.N.Y. Sept. 27, 2013) ("*R.B. I*"), which held that D.B.'s 2010–11 IEP was both procedurally and substantively adequate and denied tuition reimbursement for that school year. The Court will not repeat that history in detail here. D.B. has been diagnosed with autism, and his local Committee on Special Education ("CSE") has classified him as a "child with a disability," as defined in the IDEA, 20 U.S.C. § 1401(3), who is eligible to receive an IEP. *R.B. I*, 2013 WL 5438605, at *1. At the time of the events at issue in this litigation, D.B. was twelve years old. *See* Ex. 1 at 1.

### A. The CSE Meeting

Prior to the CSE meeting to develop D.B.'s 2011–12 IEP, Ms. Feng Ye (a DOE special education teacher) prepared a draft IEP based on her review of D.B.'s December 2010 Report of Progress from the Rebecca School (the "2010 Report"), a January 2011 Addendum to the 2010 Report (the "2011 Addendum"), the DOE's November 2010 psychoeducational evaluation of D.B., and a November 2010 classroom observation of D.B. Def. 56.1 ¶ 10; Tr. 21–22; Exs. 4–8. At the time, Ms. Ye was in her fifth year as a special education teacher assigned to the CSE, in which capacity she "[went] to schools and observe[d] children with disabilities" and "participate[d] in developing IEPs." Pl. 56.1 Statement ¶ 10; Def. 56.1 Counterstatement ¶ 10; Tr. 19–20. Prior to taking on that role, Ms. Ye spent approximately ten years as a classroom special education teacher, and approximately seven or eight years as an education evaluator. Tr. 19. Her qualifications include a Master's degree in Special Education and Educational Evaluation and a permanent Special Education teacher's license for grades K through 12. Tr. 20–21.

The CSE team—which consisted of M.L.B., Ms. Kalvin (a social worker from the Rebecca School), Ms. Cohn (D.B.'s teacher at the Rebecca School), Ms. Fochetta (a DOE school psychologist), and a parent member [1]—met to develop D.B.'s 2011–12 IEP on February 9, 2011. Pl. 56.1 ¶ 2. Shortly before the meeting began, the CSE team reviewed an August 2010 psychoeducational evaluation of D.B. that

---

[1] A "parent member" is a parent in the school district whose child previously received an IEP. N.Y. Educ. Law § 4402(1)(b)(1)(a).

M.L.B. provided. Def. 56.1 ¶ 10; Tr. 21–22. During the meeting, the CSE team reviewed the draft IEP that Ms. Ye had previously prepared. Def. 56.1 ¶ 10; Tr. 80. First, the team revised the descriptions of D.B.'s academic, socio-emotional, and physical development in the IEP based on input from M.L.B. and Ms. Cohn. Tr. 29–37; Ex. 2. Next, the team discussed the annual goals and short-term objectives in the IEP, many of which were copied directly from the 2010 Report and the 2011 Addendum. *Compare* Ex. 1 *with* Ex. 6. M.L.B. requested that the IEP include specific goals (detailed below), and the CSE ·team considered those requests. Def. 56.1 Statement ¶ 12; Tr. 51, 54, 101, 103, 106, 125, 398; Ex. 2 at 2.

The CSE team then considered what type of program to recommend for D.B. The team agreed that D.B. required a twelve-month program. Def. 56.1 Statement ¶ 12; Ex. 1 at 15. After consideration, 12:1:1 and 8:1:1 staffing ratios (student: teacher: paraprofessional) were rejected as "insufficiently supportive," and the team recommended a 6:1:1 ratio. Def. 56.1 Statement ¶ 12; Ex. 1 at 15. M.L.B. was concerned about this recommendation because "the 6:1:1 classes that they have so far assigned him to have been really low functioning." Tr. 399. In response to these concerns, Ms. Fochetta and Ms. Ye "assured [M.L.B]. that there were plenty of 6:1:1 classes that are functionally grouped." Tr. 83, 399. The CSE team also recommended a 1:1 transitional paraprofessional. Ex. 1 at 17. M.L.B. disagreed with the recommendation of a paraprofessional, based on her belief that "[D.B.] doesn't need a one-to-one person, he needs a small class ratio, because sometimes he needs one-to-one help with academics." Tr. 399.

Next, the CSE discussed D.B.'s related service mandates. The final version of the IEP recommended: two thirty-minute session of counseling per week (once per week individually, once per week in a group of two); four thirty-minute sessions of occupational therapy ("OT") per week (twice per week individually, twice per week in a group of two); and five thirty-minute sessions of speech and language therapy ("SLT") per week (three times per week individually, twice per week in a group of two). Ex. 1 at 16. No one at the IEP meeting objected to these recommendations. Tr. 38; Ex. 2 at 2. The IEP also recommended adapted physical education ("PE"), which Ms. Ye described as "programmatic." Ex. 1 at 1; Tr. 91. The IEP did not include goals specifically related to PE, nor did it expressly provide for parent counseling and training. Pl. 56.1 ¶ 16; *see* Ex. 1.

### B. The Recommended Placement

On June 17, 2011, Plaintiffs sent the district a letter indicating that they "intend[ed] to place [D.B.] at the Rebecca School ... for academic year 2011–2012, and seek reimbursement for this placement from the District." Ex. C at 1. For a description of the Rebecca School's program, see *R.B. I*, 2013 WL 5438605, at *5. In addition to objecting to the failure of the district to identify a specific placement, Plaintiffs indicated that they considered the IEP to be "inappropriate to address [D.B.'s] individual needs." Ex. C. at 2.

On June 24, 2011, Plaintiffs received a Final Notice of Recommendation ("FNR") dated June 14, 2011, which restated the CSE's recommendation of a 6:1:1 program in a specialized school and offered D.B. a placement in P.S. 79, the Horan School ("P.S. 79"). Ex. 3. The FNR stated that D.B. was to receive a "crisis para[professional]," Ex. 3, rather than the "transitional para[professional]" recommended in his IEP, Ex. 1 at 17.

M.L.B. visited P.S. 79 on June 28, 2011 and met the parent coordinator, Ms. Ortega, who stated that P.S. 79 currently housed a vocational high school, and "that the junior high kids were housed at another school." Tr. 405. Ms. Ortega also informed M.L.B. that "there were going to be some changes for the summer, and maybe there would be a junior high class there." Tr. 405. At Ms. Ortega's suggestion, M.L.B. called P.S. 79 on July 9, 2011, the first day of the summer session, and "learned that there was one 6:1:1 class for junior high age kids." Tr. 405–06. On July 13, M.L.B. returned to P.S. 79 with Ms. Kalvin, a social worker from the Rebecca School. Pl. 56.1 ¶ 33. They were introduced to Ms. Grammer, who said that she was the teacher of "the class that D.B. would be placed in." Pl. 56.1 ¶¶ 33–34. M.L.B. also spoke with the coordinator of the school's vocational program, which began in ninth grade. Tr. 408. M.L.B. told the coordinator that she "would rather [D.B.] focus on learning academics." Tr. 409. Plaintiffs did not accept the DOE's placement, and D.B. attended the Rebecca School for the 2011–12 school year. Tr. 409–10.

### C. The Administrative Proceedings

On July 5, 2011, M.L.B. and R.B. filed a due process complaint requesting a hearing before an IHO. Def. 56.1 ¶ 31. After receiving this request, the IHO ordered the DOE to reimburse Plaintiffs for 80% of D.B.'s tuition at the Rebecca School during the pendency of the administrative proceedings. Def. 56.1 ¶ 32; Pendency Dec. at 3. This order was based on D.B.'s placement at the Rebecca School in 2009–10, which was the last placement agreed upon by Plaintiffs and Defendants. Tr. 6.

Portions of the impartial hearing occurred from October 26, 2011 to January 4, 2012. Pl. 56.1 ¶ 61. Plaintiffs called four witnesses: Ms. McCourt (the Rebecca School's director), Ms. Kalvin (a social worker at the Rebecca School), Ms. Cohn (D.B.'s teacher at the Rebecca School), and M.L.B. Tr. 244, 296, 308, 383. Defendant called Ms. Ye and Ms. Sencion, a DOE special education teacher, as witnesses. Tr. 17, 141. The testimony of these witnesses has been incorporated into the facts above, and will not be repeated here.

In a February 28, 2010 decision, the IHO found that the recommended program "provide[d] the support and structure necessary to address [D.B.]'s needs." IHO Dec. at 14. The IHO determined that the recommended school "was able to implement [D.B.'s 2011–12] IEP and was capable of providing [D.B.] with the recommendations set forth in that IEP ... [which] would have provided [D.B.] with a meaningful educational benefit." IHO Dec. at 17–18.

The parents appealed this decision to an SRO on April 3, 2012. Pl. 56.1 ¶ 69. Though an SRO is required to issue a decision within 30 days upon receipt of an appeal, the deadline for a decision in this case was extended to May 30, 2012. Compl. ¶¶ 65, 66. On October 17, 2012, the SRO issued a decision holding that "the district offered [D.B.] a free and appropriate public education for the 2011–12 school year." Def. 56.1 ¶ 44. The SRO's specific findings are described in the body of this opinion. Plaintiffs challenged the SRO's decision by filing this action on February 19, 2013.

## II. LEGAL STANDARD

### A. Burlington/Carter Test

 When the state fails in its obligation to provide an appropriate public education to a child with a disability, parents may make the unilateral decision to "enroll the child in a private school and seek retroactive reimbursement for the

cost of private school from the state." *Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir.2006) (citing *School Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *M.S. ex rel. SS. v. Bd. of Educ.,* 231 F.3d 96, 102 (2d Cir.2000)). Such parents act, however, "at their own financial risk," *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (quoting *Burlington,* 471 U.S. at 373–74, 105 S.Ct. 1996), and are entitled to reimbursement only if a reviewing court finds, by the preponderance of the evidence, that: (1) "the proposed IEP was inadequate to afford the child an appropriate public education;" and (2) "the private education services obtained by the parents were appropriate to the child's needs," *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998). In addition to these two prongs, "equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief." *Frank G.,* 459 F.3d at 363–64 (alteration in original) (citing *Burlington,* 471 U.S. at 374, 105 S.Ct. 1996; *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.,* 226 F.3d 60, 68 (2d Cir.2000)).

### B. Deference to State Administrative Decisions

■■■ The adequacy of a challenged IEP and the child's entitlement to tuition reimbursement is initially determined by state administrative officers whose "rulings are ... subject to 'independent' judicial review." *Walczak,* 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). "This 'independent' review," however, "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Id.* (quot-

ing *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034). Reviewing courts should neither "rubber stamp administrative decisions" nor overlook "that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* (alteration in original) (quoting *Rowley,* 458 U.S. at 206, 208, 102 S.Ct. 3034). "Deference is particularly appropriate when ... the state hearing officers' review has been thorough and careful." *Id.*

Plaintiffs argue that little deference is owed to the IHO and SRO decisions in this case because their opinions "are poorly reasoned, and are not supported by the weight of the evidence in the record." Pl. Br. 11. With respect to the SRO, for example, Plaintiffs allege that he "failed to comply with his legal obligation to issue a decision within 30 days after receipt of a request for review," "applied an incorrect legal standard," "improperly considered retrospective evidence about what the school district claimed that it might have done if D.B. had attended P.S. 79," failed to "weigh the evidence contained within the record," and "failed to apply the statute, regulations, and case law to the evidence, ... provided only conclusory statements" and issued "a decision that is not well reasoned or supported by the record or in accord with the relevant legal standard." Pl. Br. 11.

The Court disagrees. Having reviewed the SRO's single-spaced, 33–page opinion, as well as the underlying factual record from the proceedings below, the Court concludes that the SRO's decision is thorough and well-reasoned, deserving the ordinary level of deference granted to such final state administrative decisions. *See K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.,* 530 Fed.Appx. 81, 85 (2d Cir.2013). The IHO decision is likewise sufficiently thor-

ough and reasoned to merit the ordinary level of deference. The bulk of Plaintiffs' arguments regarding the inadequacy of the SRO decision, by contrast, are "either conclusory or coterminous with their other arguments." *Id.*

Plaintiffs, for example, argue that the SRO's conclusion that the IEP appropriately provided for D.B. to be functionally grouped with students having similar needs "implicitly reversed the burden of production and proof." Pl. Br. 13. In support, Plaintiffs misleadingly excerpt the SRO Decision to suggest that the SRO concluded that Defendants had met the governing legal standard without requiring them to provide "any indication of how [they] would have reacted in light of grouping requirements had the student actually attended the proposed public school site." *See* Pl. Br. 13. In context, however, it is clear that the SRO in fact considered evidence from Defendants regarding the functional levels of students in the class to which D.B. was to have been assigned— which included one student at the sixth grade level, and four students who functioned at somewhere between a kindergarten and third grade level, like D.B.—in order to reach the reasonable conclusion that D.B. could have been "suitabl[y] group[ed]" in compliance with his IEP if he had joined that class. SRO Dec. at 31– 32. This is consistent with the SRO's approach to other issues raised by Plaintiffs and demonstrates that the decision is deserving of the deference ordinarily afforded such state administrative decisions.

The Court also disagrees with Plaintiffs' assertion that the SRO's statement that "the Parents had rejected the Department's recommended placement at P.S. 79 in their June 17, 2011 letter," notwithstanding that the final placement recommendation had not yet been issued, was in error. Pl. Br. 14. As an examination of the June 17, 2011, letter indicates, the letter plainly states that the parents reject *any* placement under the February 2011 IEP, which they contend to be "inappropriate to address [D.B.'s] individual needs." Ex. C. at 2. Under these circumstances, the SRO's characterization of the June 17, 2011, letter was neither obviously "incorrect[ ]" nor unreasonable, and does not justify departure from the ordinary level of deference afforded to such decisions.

Plaintiffs' other arguments regarding the alleged defects in the SRO decision, including its late issuance, Pl. Br. 11, the consideration of retrospective evidence, Pl. Br. 11, the 6:1:1 classroom, Pl. Br. 12, and the crisis paraprofessional, Pl. Br. 12–13, are addressed below.

### III. ADEQUACY OF IEP

■ Courts must consider both procedural and substantive adequacy in determining whether a challenged IEP adequately afforded the child a free and appropriate education, or FAPE. *See R.E. ex rel. J.E., M.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189–90 (2d Cir. 2012); *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. Plaintiffs allege that D.B.'s IEP contained both procedural and substantive violations of the IDEA, which resulted in D.B. being denied an appropriate public education. Plaintiffs additionally argue that the DOE improperly assigned D.B. to a school that was unable to implement his IEP. For the reasons set forth below, the Court concludes that D.B.'s 2011–12 IEP was procedurally and substantively adequate, and that D.B.'s assignment to P.S. 79 was not improper.

#### A. Procedural Adequacy

■ In determining whether an alleged procedural violation in a child's IEP re-

sulted in the denial of an appropriate public education, the Court first must determine if the DOE deviated from the procedural requirements set forth in the IDEA. *R.E.*, 694 F.3d at 189–90 (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005)). The statute is clear, however, that not every violation of the IDEA'S procedural requirements will result in the denial of a FAPE. Rather, a procedural violation will result in the denial of a FAPE only if it: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). For the reasons set forth below, the Court finds that the IEP was procedurally adequate.

*1. Composition of CSE Team*

■ Plaintiffs seem to argue[2] that the composition of D.B.'s CSE team—and particularly the inclusion of Ms. Ye—deprived D.B. of an appropriate public education. *See* Pl. Mem. 6–7. In particular, Plaintiffs object that: (1) Ms. Ye has never taught in a 6:1:1 classroom, the type of classroom recommended in the IEP; (2) Ms. Ye has never taught middle school students like D.B.; and (3) Ms. Ye had only observed D.B. for 25 minutes in November 2010. *Id.*

The Court observes that Plaintiffs cite no legal authority for the proposition that Ms. Ye's presence on D.B.'s CSE team was improper by virtue of her lack of experience teaching middle school students in a 6:1:1 classroom, or the fact that she had observed D.B. only once before being as-

signed to his CSE team. Indeed, no law or regulation regulates the composition of the CSE team on these grounds. There was, moreover, ample evidence from which the SRO could find Ms. Ye to be qualified to participate on the CSE team, including her ten years of classroom special education experience, her special education license, and her Master's degree in Educational Evaluation. Tr. 20–21.

That Ms. Ye was concededly not D.B.'s own special education teacher may have resulted in a procedural violation. *See* 8 N.Y.C.R.R. § 200.3(a)(1)(iii) (requiring that the CSE team include a special education teacher "of the student"); 20 U.S.C. § 1414(d)(1)(B)(iii) (requiring that the team include a special education teacher "of such child"). As the SRO, however, found, whatever problems may have been posed by Ms. Ye's relative lack of familiarity with D.B. were significantly mitigated by the inclusion and participation of M.L.B. and Ms. Cohn, D.B.'s Rebecca School teacher, as well as the CSE team's reliance on D.B.'s Rebecca School progress reports. *See* SRO Dec. at 13–14. Under these circumstances, the CSE team had sufficient access to specific information about D.B. in order to make a reasonable recommendation. *Cf.* 20 U.S.C. § 1415(f)(3)(E)(ii). Accordingly, the Court finds that Ms. Ye's participation on D.B.'s CSE team did not result in the denial of an appropriate public education. *Cf. A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, 964 F.Supp.2d 270, 279–81 (S.D.N.Y.2013) (finding that inclusion of special education teacher who was not the student's teacher constituted a procedural violation but did not result in the denial of a FAPE).

---

**2.** Plaintiffs' briefing is not a model of clarity, and their Argument section more closely resembles an expanded statement of facts. *See, e.g.*, Pl. Opp. 6–7 (describing Ms. Ye's qualifi- cations without indicating whether this is contended to violate any relevant legal provision).

The Court's conclusion is not altered by the fact that M.L.B. and Ms. Cohn disagreed with the IEP's recommendations that D.B. be placed in a 6:1:1 class, with a 1:1 transitional paraprofessional. *See* Pl. Mem. 7. The hearing record reflects that D.B.'s mother and Ms. Cohn were active participants in the CSE meeting, and that their expressed concerns were considered in the drafting of the IEP, although not all of their recommendations were ultimately adopted. *See* Tr. 320–23 (indicating that Ms. Cohn's opinions were solicited and that the IEP goals were adapted from Rebecca School records); 393–400 (describing mother's participation in CSE team meeting and indicating that the CSE team made recommendations in response to her concerns about the 6:1:1 classroom). This is sufficient to render the CSE procedurally adequate, as "all that is required is a parent's participation, not that the parent have the final word." *A.M.*, 964 F.Supp.2d at 280.

### 2. Failure to Conduct Vocational Evaluation

█ Plaintiffs further allege that the CSE team's failure to conduct a vocational assessment caused his IEP to be procedurally inadequate by "prevent[ing] the IEP team from obtaining necessary information about [D.B.]," Pl. Mem. 20, particularly in light of D.B.'s assignment to "a vocational high school," SRO Dec. 16. New York regulations require that "students . . . who are age 12 and over . . . receive an assessment . . . to determine vocational skills, aptitudes, and interests." 8 N.Y.C.R.R. § 200.4(b)(6)(viii). Thus, as the SRO determined, the CSE team's failure to conduct such an assessment for D.B.—who was twelve years old at the time of the CSE meeting—constituted a procedural violation. SRO Dec. at 16.

█ Nevertheless, the Court agrees with the SRO's determination that the fail-

ure to conduct a vocational assessment did not render the IEP procedurally inadequate. *See* SRO Dec. at 16. As noted in *R.B. I*, " '[t]he absence of one single measure should not itself render an IEP invalid,' " so long as the CSE team otherwise has sufficient information about the student to determine the student's educational needs. *R.B. I*, 2013 WL 5438605, at *9 (quoting *D.B. v. N.Y.C. Dep't of Educ.*, 966 F.Supp.2d 315, 330–31 (S.D.N.Y.2013)). Here, there is evidence that the CSE team considered a host of measures in drafting the IEP, including D.B.'s Rebecca School progress reports, the results of Ms. Ye's classroom observation, and two psycho-educational evaluations. Tr. 21–22; Ex. 4 at 4–8. Plaintiffs' insistence that D.B. should have been vocationally assessed is, moreover, contrary to their position that D.B. requires academic rather than vocational training. Tr. 408–09. Under these circumstances, the Court finds that the failure to conduct a vocational assessment did not result in the denial of a FAPE.

Plaintiffs' argument that the failure to conduct a vocational assessment was especially egregious because D.B. was assigned to a vocational high school is meritless, as D.B. was not assigned to a vocational program. Contrary to Plaintiffs' assertions, *see* Pl. Br. 21 (arguing that "[t]he record makes clear" that D.B. would have been assigned to a vocational program"), this is supported by the record, even when the Court takes into account only what was known to M.L.B. at the time she decided to enroll D.B. in the Rebecca School. As M.L.B. testified, she was expressly informed that the vocational program at the school was for students in the ninth grade and higher, Tr. 408, at a time when D.B. was twelve years old and not yet in the ninth grade, Tr. 422.

### 3. Parent Training

█ Plaintiffs argue that D.B. was denied a FAPE by virtue of his IEP's failure

"to provide D.B. or his Parents with parent training and counseling." Pl. Br. 23; *see* Ex. 1. As the SRO noted, an IEP's failure to address "the extent to which parent counseling and training will be provided to parents, when appropriate" is a procedural violation. *See* SRO Dec. at 26.

"[I]n the ordinary case," the failure of an IEP to provide for parent counseling and training will not result in the denial of a FAPE. *R.E.*, 694 F.3d at 191. As the Second Circuit has observed, "[t]he presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy" of an IEP—and indeed, Plaintiffs have not shown that the absence of a parent-counseling provision has had any impact on the educational recommendations of the IEP. *Id.* (citing *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 811 (8th Cir. 2011)). Moreover, school districts are required to provide parent counseling, and D.B.'s parents were expressly informed of the district's parent training programs at the CSE meeting. *See* Tr. 59. In other words, the failure of an IEP to expressly provide for parent training does not typically mean that parents will not receive required trainings. *See F.B. v. N.Y.C. Dep't of Educ.*, 923 F.Supp.2d 570, 585–86 (S.D.N.Y.2013) (finding that failure to include provision on parent training did not result in denial of a FAPE where evidence showed that such training was indeed available at the assigned school). For these reasons, the Court finds that the IEP's failure to provide for parent training and counseling did not result in the denial of a FAPE.

### 4. Tardiness of SRO Decision

Plaintiffs also assert that the SRO "committed legal error" in "fail[ing] to comply with his legal obligation to issue a decision within 30 days of a request for a review." Pl. Mem. 11. The SRO Decision was issued on October 17, 2012, several months after both the initial appeal of the IHO decision on April 3, 2012, and the extended May 30, 2012, deadline obtained by the DOE. Compl. ¶ 64; Def. 56.1 ¶ 34. Under New York law, "[t]he [SRO] must ensure that, not later than 30 days after the receipt of a request for a review, a final decision is reached and a copy of the written decision ... is mailed to each of the parties." 8 NYCRR § 200.5(k)(2); *see also* 34 C.F.R. § 300.515(b). This provision was clearly violated by the issuance of the SRO Decision in October.

Even if the tardiness of the SRO decision constituted a procedural violation, however, that procedural violation did not result in the denial of a FAPE. *See Antonaccio v. Bd. of Educ.*, 281 F.Supp.2d 710, 723 (S.D.N.Y.2003) ("The SRO's failure to issue a timely decision is not relevant to the determination of whether the 1999–2000 IEP that the CSE devised is procedurally appropriate."); *see also Murphy v. Arlington Cent. Sch. Dist.*, No. 99 Civ. 9294(CSH), 1999 WL 1140872, at *4 (S.D.N.Y. Dec. 13, 1999) (declining to take equitable action until after the extended deadline for the SRO's decision passed, even though extension was granted after the SRO's decision was already late). Indeed, the late issuance of the SRO Decision could have no impact on the substantive recommendations of the IEP or the parent's ability to participate in the IEP process. Nor did it have any other negative impact on the child in this case, as the IHO issued an interim order requiring the DOE to reimburse D.B.'s parents for his tuition at the Rebecca School from July 5, 2011 (when the due process complaint was filed) "until ... a final decision [was] rendered." Pendency Dec. at 3. *Cf. Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 164–65 (2d Cir.2004) (directing district court to consider fairness of penal-

izing plaintiffs for DOE's delay in issuing SRO decision in adjudicating claim for tuition during pendency of state review proceedings). Accordingly, the Court finds that the late issuance of the SRO decision caused Plaintiffs no harm and did not result in the denial of a FAPE. *Cf. Grim v. Rhinebeck School Dist.*, 346 F.3d 377, 381–82 (2d Cir.2003) (finding no denial of a FAPE resulted from delays in review of IEP and no harm to student, because IEPs were substantively adequate).

### 5. Goals and Objectives

 Plaintiffs allege that D.B.'s 2011–12 IEP was procedurally inadequate because it "failed to include measurable annual goals and included no short term objectives." Pl. Br. 22. Plaintiffs further object that the SRO and IHO improperly "excused [the failure to include measurable goals] by explicitly reading the annual goals in conjunction with the information contained within the IEP's short-term objectives section." Pl. Br. 22.

The IDEA requires an IEP to include "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(II); *see also* 34 C.F.R. 300.320(a)(2); 8 N.Y.C.R.R. 200.4(d)(2)(iii). Each annual goal must additionally include "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal." 8 NYCRR § 200.4(d)(2)(iii)(b); *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(III). Having examined the IEP, the Court agrees with the SRO finding that the goals and objectives set forth therein are sufficiently "detailed, measurable, and designed to suit the student's needs" to satisfy the requirements of the IDEA. SRO Dec. at 17.

Plaintiffs' arguments to the contrary appear to derive solely from the format of the IEP form, rather than the substantive content of the goals and objectives actually set forth. *See* Pl. Reply 11 (arguing that IHO and SRO could not look "to information contained within the short term objectives section of D.B.'s IEP to cure the deficits in D.B.'s annual goals"). For each set of goals and objectives, the IEP form contains a field labeled "Annual Goal," below which is a separate but clearly related field labeled "Short–Term Objectives." *See* Ex. 1, at 6. The "Annual Goal" field is approximately half the size of the "Short–Term Objectives" field. Perhaps as a consequence of this, the text in the "Annual Goal" field sets forth a short and broadly worded goal, which is then broken down into a series of concrete goals in the field labeled "Short–Term Objectives." For example, the second "Annual Goal" states: "In one year, given direct instruction and using visual and verbal cues, [D.B.] will continue to develop reading comprehension skills by demonstrating his ability to:"—a somewhat vague goal that is thus elaborated in the "Short–Term Objectives" field below:

(1) answer "what, when" questions independently from the stories that he reads in class with 80% accuracy measured by teacher observation and teacher made tests.

(2) answer WHY questions about a familiar story given visual/verbal choices with 60% accuracy measured by teacher observation and teacher-made tests.

(3) recall 3 details independently from short texts using 'beginning, middle, end' with 70% accuracy measured by teacher observation and teacher-made tests.

Ex. 1, at 6.

As this excerpt demonstrates, the IEP contains detailed and objective standards by which D.B.'s progress can be measured on both an annual and short-term basis—for example, D.B.'s reading comprehension

skills can be measured, in the short term, by whether he is able to answer certain questions about a text at a sufficient rate of accuracy, according to observation and testing by his teacher. The other goals and objectives set forth in the IEP are similarly detailed, measurable, and suited to D.B.'s individual needs. Accordingly, the Court agrees with the SRO conclusion that there was no denial of a FAPE on this ground. *See R.B. I,* 2013 WL 5438605, at *13 ("[E]ven where certain goals are overly broad, courts have found an IEP to be satisfactory where short-term objectives are sufficiently detailed.") (quoting *E.F. v. N.Y.C. Dep't of Educ,* No. 12 Civ. 2217(MKB), 2013 WL 4495676, at *19 (E.D.N.Y. Aug. 19, 2013)).

The Court is not persuaded otherwise by Plaintiffs' protest that the goals in the IEP cannot be measured because they contain no "baseline levels of functioning." Pl. Br. 22. As the example set forth above demonstrates, the goals are stated in absolute terms and can be measured without reference to a baseline.

### 6. Cumulative Effect

■ Having determined that none of the procedural violations identified resulted in the denial of a FAPE when considered individually, the Court proceeds to consider their aggregate effect. *See R.E.,* 694 F.3d at 191. Even multiple procedural violations may not result in the denial of a FAPE when the "deficiencies ... are more formal than substantive." *F.B.,* 923 F.Supp.2d at 586. Here, the Court agrees with the IHO and SRO findings that procedural violations identified were formal rather than substantive and did not result in the denial of a FAPE, whether considered individually or cumulatively, and that the IEP was procedurally adequate.

### B. Substantive Adequacy of IEP

■ Having determined that the procedural violations in the IEP process did not result in the denial of a FAPE, the Court turns to the substance of the IEP. The substantive adequacy of an educational placement "turns on whether [it] is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.,* 459 F.3d at 364 (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034; *Muller ex rel. Muller v. Comm. on Special Educ.,* 145 F.3d 95, 105 (2d Cir.1998)). The Second Circuit has held that an IEP meets this substantive standard if it is "'likely to produce progress, not regression' and 'affords the student ... an opportunity greater than mere trivial advancement.'" *E.S. ex rel. B.S. v. Katonah–Lewisboro Sch. Dist.,* 487 Fed.Appx. 619, 621 (2d Cir.2012) (quoting *Cerra,* 427 F.3d at 195). Any substantive inadequacy in a student's IEP results in the denial of a free and appropriate public education and entitles parents to reimbursement. *See M.W. v. N.Y.C. Dep't of Educ.,* 725 F.3d 131, 143 (2d Cir.2013) (quoting *R.E.,* 694 F.3d at 190).

■ The Court defers to the IHO and SRO in finding that the recommended 6:1:1 placement, as supplemented by a 1:1 paraprofessional, was "sufficiently tailored to address [D.B.'s] individual needs and was an appropriate placement in order to offer [him] a FAPE." SRO Dec. 26; *see also* IHO Dec. 13–14. This is exactly the type of "educational policy judgment to which we owe the state deference." *R.E.,* 694 F.3d at 192 (deferring to SRO decision that 1:1 paraprofessional support was adequate, where supported by "sufficient evidence"). The record, moreover, reveals that this recommendation was based upon careful consideration of D.B.'s particular educational needs, as demonstrated by "the district's psychological evaluation, the December 2010 Rebecca School progress report, and the January 2011 Rebecca

School addendum, as well as discussion that took place at the CSE meeting." SRO Dec. 24; *see also* Tr. 21–22. Accordingly, the Court finds that the IEP to be substantively adequate.

The Court also finds that the record supports the SRO conclusion that M.L.B. and Ms. Cohn's concerns regarding D.B.'s need for "a small class size," Tr. 399, were sufficiently addressed by the IEP, SRO. Dec. 24–26. In addition to recommending that D.B. receive the assistance of a full-time transitional paraprofessional, the IEP "incorporated environmental modifications and human/material resources . . . that the CSE believed the student required in order to be successful in the" recommended classroom setting. SRO Dec. 24. While M.L.B. and Ms. Cohn may have preferred that D.B. receive 1:1 support from a teaching assistant, rather than a paraprofessional, *see* Tr. 400, the CSE team was not required to yield to their preferences, and the IEP was not rendered substantively inadequate by their disagreement. *See Bryant v. N.Y. State Educ. Dep't,* 692 F.3d 202, 215 (2d Cir.2012) ("The IDEA 'guarantees' only that students with disabilities are provided 'an appropriate education, not one that provides everything that might be thought desirable by loving parents.' ") (quoting *Walczak,* 142 F.3d at 132).

*C. Implementation of IEP*

██ Plaintiffs argue that, even if the IEP were substantively adequate, the DOE failed to provide a FAPE because the assigned school was unable to implement the IEP. Pl. Br. 8. In particular, Plaintiffs argue that the assigned school was inappropriate because: (1) Plaintiffs were offered a seat at P.S. 79 with a crisis management paraprofessional instead of a transitional paraprofessional; (2) during her visit to P.S. 79, M.L.B. was told "that the site was a vocational school for high school students, that there was no middle school class, but there *might* be a middle school class during the summer of 2011, that *might* continue in September 2011;" (3) "P.S. 79 staff had no idea what class D.B. was to be placed in;" (4) "M.L.B. was informed by P.S. 79's Parent Coordinator that the school lacked an occupational therapy gym and had no occupational therapy hanging equipment." Pl. Br. 8–9, 17.

The SRO rejected Plaintiffs' "concerns regarding the appropriateness of the particular public school site to which [D.B.] had been assigned," finding that the hearing record did not support their assertion that "the [DOE] would have deviated from substantial or significant provisions of [D.B.'s] IEP in a material way and thereby precluded the student from the opportunity to receive educational benefits" if they had accepted the offered placement at P.S. 79. SRO Dec. 28–30. Plaintiffs argue that this conclusion can be disregarded because the SRO improperly relied upon "retrospective evidence," *see* Pl. Br. 15–17, which the Second Circuit has held cannot be used to "rehabilitate a deficient IEP after the fact," although it is admissible "[to] explain[ ] or justif[y] the services listed in the IEP," *K.L.,* 530 Fed.Appx. at 85 (quoting *R.E.,* 694 F.3d at 186). The Court, however, need not reach this question, for sufficient permissible evidence supports the SRO's conclusion that P.S. 79 was an appropriate placement. *See id.* at 85.

On June 24, 2011, Plaintiffs received Final Notice of Recommendation ("FNR"), which formally offered D.B. a placement at P.S. 79, and further stated that the IEP had recommended that he receive assistance from a "crisis para[professional]." *Compare* Ex. 1 *with* Ex. 3. According to Plaintiffs, this statement represents a "failure to appropriately implement the IEP's recommendations"—which included the assignment of a *transitional* and not a crisis paraprofessional—in violation of the

law. Pl. Br. 8. As Defendants point out, however, the notation on the FNR may have been nothing more than a "clerical error," and there is no evidence in the record that the DOE could not or would not have provided D.B. with a transitional paraprofessional if he had attended P.S. 79. Def. Br 12. There is, furthermore, no evidence that a crisis paraprofessional would not be able to perform the functions of a transitional paraprofessional, or would otherwise cause D.B. to be denied a FAPE. *Cf. K.L.*, 530 Fed.Appx. at 85 (finding no denial of FAPE when "parents offer no argument or evidence" that the assigned "crisis" paraprofessional could not perform the same functions as the "health" paraprofessional requested by parents). Accordingly, the Court finds that the use of the term "crisis para" in the FNR did not result in the denial of a FAPE.

Nor does the record support Plaintiffs' argument that D.B. was improperly assigned to a vocational high school without a middle school class. Pl. Br. 8. M.L.B. testified that, on June 28, 2011, she was told by P.S. 79's parent coordinator there were "no junior high classes at the time," as "the junior high kids were housed at another school." Tr. 405. M.L.B. also testified that she was told that "maybe there were going to be changes for the summer," so that there might be a junior high-aged class at the location during the summer that D.B. was scheduled to enroll. Tr. 405. As this testimony plainly demonstrates, M.L.B. was expressly told that there *were* classes for junior high-aged students, which were held at another location during the regular school year, and which might be held in the same building as the high school classes during the summer. *See* SRO Dec. 33 (noting "that during the balance of the school year middle school classes were held at another location"). That is, M.L.B. had no reason to doubt that there would be a class for her son, although she did have reason to question the actual location of his classroom. This uncertainty regarding the physical location of the junior high class, however, does not result in the denial of a FAPE, as "there is no requirement in the IDEA that the IEP name a specific school location." *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir.2009). In light of the foregoing, the Court finds that the record supports the conclusion that P.S. 79 would have provided D.B. with an appropriate junior high class.

Plaintiffs' argument that the IEP was rendered defective by the school district's failure to prospectively identify during M.L.B.'s visit either D.B.'s assigned classroom teacher or the "ages or academic abilities" of the other students in the assigned class is likewise unavailing. *See* Pl. Br. 8, 18. "[C]ourts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed," and this includes evidence about the teacher or classmates in that particular classroom. *N.K. ex rel. J.K. v. N.Y.C. Dep't of Educ.*, 961 F.Supp.2d 577, 590 (S.D.N.Y.2013) (citing *R.E.*, 694 F.3d at 186–87); *see also M.S. v. N.Y.C. Dep't of Educ.*, 2 F.Supp.3d 311, 331, 2013 WL 7819319, at *16 (E.D.N.Y. 2013) ("Just as a school district may not justify the adequacy of an IEP based on evidence that a student would have been assigned a specific teacher, ... a parent may not challenge the adequacy of a written IEP by attacking the qualifications or experience of the prospective classroom teacher.").

Finally, Plaintiffs argue that P.S. 79 would have been unable to implement D.B.'s IEP because it "lacked an occupational therapy gym and had no occupational therapy hanging equipment." Pl. Br. 8–9. Plaintiffs, however, have not provided evidence that "occupational therapy hanging equipment" was necessary in order to

address D.B.'s needs, nor have they shown that Defendant was "unwilling or unable to obtain such equipment." *R.B. I*, 2013 WL 5438605, at *16 (citing *N.K.*, 961 F.Supp.2d at 592; *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 12 Civ. 2113(WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012)); *see also D.B. v. N.Y.C. Dep't of Educ.*, 966 F.Supp.2d 315, 338 (S.D.N.Y.2013) ("[T]he fact that [the DOE special education teacher] did not know … whether the school had a sensory gym does not render the DOE's recommended placement inappropriate."). There is, moreover, evidence in the record indicating that P.S. 79 was indeed able to meet D.B.'s occupational therapy and sensory needs. *See* Tr. 151–52, 171, 204. The Court therefore defers to the SRO conclusion that D.B.'s "sensory needs could have been adequately addressed at the assigned school." SRO Dec. 30.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the 201112 IEP was both procedurally and substantively adequate, and that the assigned school was not improper. As such, the Court need not reach Plaintiffs' claims regarding the propriety of their unilateral placement of D.B. at the Rebecca School. Regardless of the adequacy of that school, the DOE need not reimburse Plaintiffs for tuition for the 201112 school year because it offered D.B. a FAPE for that year. Defendant's Motion for Summary Judgment is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.

This resolves Docket Numbers 11 and 15. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

